Raymond L. HORN and Joyce A. Horn, Joseph Dues and Sharon Dues, Alvin Timmerman and Rose Timmerman, Walter A. Schwieterman and Frieda L. Schwieterman, Eric E. Link and Karen K. Link, Plaintiffs,

v.

A.O. SMITH CORPORATION and A.O. Smith Harvestore Products, Inc., Defendants.

Civ. Nos. 1:92cv232, 1:92cv233, 1:92cv243, 1:92cv244 and 1:92cv273.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Feb. 18, 1994.

Sherrill W. Colvin, Haller and Colvin, Fort Wayne, IN, David Wade Peck, Barron Peck and Bennie, Cincinnati, OH, Paul F. Shappell, Whiteman Shappell Burkett, Portland, IN, B.J. Hammarback, River Falls, WI, for Walter A. Schwieterman, Frieda L. Schwieterman, Alvin Timmerman, Rose Timmerman, Sharon Dues, Joseph Dues, Raymond L. Horn, Joyce A. Horn.

John C. Dods, Margaret D. Lineberry, Shook Hardy and Bacon, Kansas City, MO, D. Randall Brown, Deborah A. Lawrence, Richard E. Steinbronn, Barnes and Thornburg, Fort Wayne, IN, Donald E. Egan, Lee Ann Watson, Linda L. Cashmore, Clay A. Tillack, Stewart T. Kusper, Katten Muchin and Zavis, Chicago, IL, for A.O. Smith Corp.

John C. Dods, Margaret D. Lineberry, Shook Hardy and Bacon, Kansas City, MO, D. Randall Brown, Deborah A. Lawrence, Richard E. Steinbronn, Barnes and Thornburg, Fort Wayne, IN, Donald E. Egan, Lee Ann Watson, Linda L. Cashmore, Katten Muchin and Zavis, Chicago, IL, for A.O. Smith Harvestore Products, Inc.

Sherrill W. Colvin, Haller and Colvin, Fort Wayne, IN, David Wade Peck, Barron Peck and Bennie, Cincinnati, OH, B.J. Hammarback, River Falls, WI, for Eric E. Link, Karen K. Link.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on motions for summary judgment filed by the defendants on October 1, 1993. Also before the court is defendants' motion to strike the affidavit of Cheryl Wolf, filed December 15, 1993. The parties finished briefing the motions on January 5, 1994.

**1228**

### Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512; *In Re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

### Background

The plaintiffs in the five cases presently before the court are all dairy farmers who

purchased or leased Harvestore silos for storing their corn and/or hay, which they subsequently fed to their dairy cows. All of the farmers later experienced problems with their dairy herds which they now allege were caused by the faulty design of the silos which permitted the stored feed to spoil. Since all of the plaintiffs have sued the same two defendants and have alleged the same causes of action, the five cases have been consolidated for pre-trial purposes. Thus, the parties have submitted only one set of briefs for each of the two defendants' motions for summary judgment which are directed to all five of the pending cases. Likewise, this order is directed to all five cases.

The cast of characters are as follows. The defendants in these cases are A.O. Smith Corporation ("A.O. Smith") and A.O. Smith Harvestore Products, Inc. ("AOSHPI"). A.O. Smith is a Delaware corporation with its principal offices located in Milwaukee, Wisconsin. It is a publicly-owned company with its stock traded on the American Stock Exchange. A.O. Smith's subsidiaries and divisions are engaged in a variety of businesses, including manufacturing automotive products, electric motors, water heaters, and fiberglass piping.

AOSHPI is one of A.O. Smith's subsidiaries. AOSHPI's principal offices and facilities are located in DeKalb, Illinois, where it manufactures a variety of farming equipment, including the Harvestore silos at issue in the cases presently before the court.

Plaintiffs Raymond and Joyce Horn ("the Horns") acquired a 20' by 50' Harvestore silo in August 1977. The silo was installed on their farm in the fall of 1977 and the Horns filled it with corn silage. On April 29, 1981, the Horns acquired a 20' by 70' Harvestore silo which was installed on May 19, 1981 and used for storing haylage.

Plaintiffs Joseph and Sharon Dues ("the Dues") acquired a 20' by 80' Harvestore silo on May 11, 1981. This silo was installed on August 7, 1981 and was used to store haylage. The Dues also acquired a 20' by 40' silo on May 28, 1981 which was installed on October 6, 1981 and was used to store ground ear corn.

Plaintiffs Alvin and Rose Timmerman ("the Timmermans") acquired a 20' by 80' Harvestore silo on April 23, 1976. This silo was installed on May 12, 1976 and was used to store haylage. On September 8, 1980, the Timmermans acquired a 20' by 50' Harvestore silo which was installed on September 12, 1980 and was used to store corn silage.

Plaintiffs Walter and Frieda Schwieterman ("the Schwietermans") acquired a 20' by 70' Harvestore silo on March 9, 1978. This silo was installed on August 7, 1978. The Schwietermans also acquired a 20' by 35' Harvestore silo on July 18, 1980 which was installed on July 31, 1980.

Plaintiffs Eric and Karen Link ("the Links") acquired a 20' by 40' Harvestore silo on December 8, 1980. This silo was installed on June 3, 1981 and used to store corn silage. On August 10, 1981, the Links acquired a 20' by 60' Harvestore silo which was installed on August 21, 1981 and used to store haylage.

In their first amended complaints, the plaintiffs have alleged five causes of action. The first cause of action alleges breach of express warranties. The plaintiffs claim that the defendants, through their own employees and agents and through the acts of a licensed Harvestore dealer, induced plaintiffs to enter into the contracts to lease the Harvestore silos through the use of oral and written representations of a significant and material nature, including but not limited to the following assertions and representations: (1) that the Harvestore silos were sealed units and that virtually no oxygen would come into contact with ensiled feed when doors and hatches were closed, thereby eliminating feed spoilage; (2) that the breather bags in the silos would compensate for air or pressure changes within, and that air entering during use of the unloading components would be insignificant due to the design of the unloader door; (3) that the small amount of air entering the silos during unloading would not be harmful to the ensiled feed because such air would be converted into a harmless gas; (4) that only a repairable problem or improper use of the silos would cause additional air to enter the silos; (5) that the higher cost of the Harvestore silos was justified by the fact that the feed produced therein would greatly

reduce or eliminate entirely the need for protein supplements because the Harvestore silos would prevent excessive fermentation as well as oxidation, dry matter, and nutritional losses, thereby creating a warm "caramelized" product which would be more palatable and nutritious for the cows; (6) that use of feed produced by the Harvestore silos would increase milk production; (7) that the silos were nearly maintenance-free and would last a lifetime; (8) that Harvestore owners were part of the "Harvestore Family", which meant that defendants' representatives were educated, trained, and equipped to give prompt service, repair, and advice regarding the Harvestore silos; (9) that A.O. Smith and AOSHPI were actually one and the same company and that, therefore, the silos had the backing of a large, successful, century-old business; and (10) that farm profits would increase through the use of the Harvestore silos.

The plaintiffs claim that these representations were material and substantial with respect to the lease/purchase of the subject silos, were relied upon by plaintiffs in entering into the lease/sales contracts, and extended to the future performance of the silos. Plaintiffs further claim that the Harvestore silos failed to perform as represented in that: (1) the Harvestore silos were not "oxygen-free" or "oxygen limiting"; (2) the Harvestore silos enhanced oxygen contact with ensiled feed, causing increased mold, spoilage, and toxins in the feed (3) feed produced by the silos had greatly decreased protein and nutrient values; (4) feed produced by the silos resulted in decreased milk production in plaintiffs' dairy cattle, unhealthy animals, and death of livestock and offspring; (5) the Harvestore silos inherently require frequent service and repairs; (6) use of the Harvestore silos has increased farm expenses and decreased farm profits for the plaintiffs.

The plaintiffs' second cause of action alleges breach of contract in that the Harvestore silos leased/purchased by the plaintiffs are defective and cannot be made to perform as represented by defendants, thus denying plaintiffs of the benefit of their bargain as well as constituting a failure of consideration.

Plaintiffs' third cause of action alleges breach of implied warranty of fitness for a particular purpose. Plaintiffs allege that at the time that the Harvestore silos were leased/sold to the plaintiffs, the defendants were fully aware of the particular purposes for which the silos were intended and knew further that plaintiffs were relying upon the defendants' representations, skill, and judgment in the selection and furnishing of the Harvestore silos. Plaintiffs claim that the defendants breached this implied warranty by not providing silos which were fit for the purposes intended.

Plaintiffs' fourth cause of action alleges strict liability. Plaintiffs allege that the Harvestore silos were defective in design, manufacture, assembly, fabrication, and formulation when they left the defendants' premises.

The plaintiffs' fifth cause of action alleges fraud in that the defendants induced the plaintiffs to lease/purchase the Harvestore silos by the use of oral, written, and/or cinematic presentations which contained promises, assertions, representations, and materials which the defendants knew were false, and which were made with the intent to deceive and defraud the plaintiffs who justifiably relied on the inducements to their detriment and damage.

In support of their motions for summary judgment, the defendants first allege that all of the plaintiffs' causes of action, which were originally filed in the fall of 1992[1], are barred by the applicable statutes of limitations. The plaintiffs' five causes of actions have the following limitations periods: (1) breach of express warranty: four years from the date of delivery (Indiana Code § 26–1–2–725); (2) breach of contract for the sale of goods: four years after the cause of action accrues (Indiana Code § 26–1–2–725); (3) breach of implied warranty of fitness for a particular purpose: four years from the date of delivery (Indiana Code § 26–1–2–725); (4) strict liability: two years after the cause of action has

1. The Horns and the Dues filed their respective original complaints on September 16, 1992, the Timmermans and the Schwietermans filed on October 1, 1992, and the Links filed on November 16, 1992.

accrued, but not more than ten years from delivery (Indiana Code § 33–1–1.5–5); and (5) fraud: six years after the cause of action has accrued (Indiana Code § 34–1–2–1).

 The court will first discuss the plaintiffs' allegations of fraud (Count V) since fraud has the longest statute of limitations of any of plaintiffs' alleged causes of action. Indiana Code § 34–1–2–1 provides that an action for fraud must be brought within six years after the cause of action has accrued. In Indiana, a cause of action for fraud accrues "when the resultant damage of a tortious act is susceptible of ascertainment." *INB Nat'l Bank v. Moran Elec. Serv., Inc.,* 608 N.E.2d 702, 708 (Ind.App.1993), citing *Madlem v. Arko,* 592 N.E.2d 686 (Ind.1992). Or, stated in another way, "a tort claim accrues and the statute of limitations thus begins to run when the plaintiff knew or, in the exercise of ordinary diligence, should have discovered that an injury had been sustained as a result of the tortious act of another." *Fager v. Hundt,* 610 N.E.2d 246, 250 (Ind.1993).

In support of their motions for summary judgment, the defendants argue that all of the plaintiffs knew or should have known, more than six years before they filed their lawsuits, that the Harvestore silos were not producing the benefits and profits expected, and thus that the alleged representations regarding the silos' performance were not true. The plaintiffs, however, strongly assert that they did not know, and reasonably could not have known, that the misrepresentations concerning their Harvestore silos were the cause of their damages until December of 1991. In December of 1991, the plaintiffs attended a group meeting at the Dues' farm at which time several lawyers spoke to the group and explained how the Harvestore silos permitted the stored feed to spoil which, in turn, caused ill effects in the plaintiffs' dairy herds.

For purposes of their motions for summary judgment, the defendants have assumed that the claimed representations were made to the plaintiffs and were false. The plaintiffs, in turn, have stated that:

> The facts are undisputed that the Plaintiffs variously knew of milk production deficiencies, increased herd health problems, lack of savings on feed supplements, and thus insufficient cash flow, within short periods after their Harvestores were put into use. However, the record is also clear at this point that none of the Plaintiffs related the source of their difficulties to the Harvestore itself. At issue is whether or not Plaintiffs, in the exercise of ordinary diligence, *should* have discovered that their injuries had been sustained *as a result of the fraud of the defendants.*

Plaintiffs' Memorandum in Opposition to AOSHPI's Motion for Summary Judgment at 4. (Emphasis in original).

Thus, the only question before the court at this point is to determine whether, as a matter of law, the plaintiffs knew or should have known, before or during the fall of 1986, that their damages were the result of the defendants' alleged misrepresentations.

### Raymond and Joyce Horn

With respect to the Horns, the defendants have presented the following evidence. A 20' by 50' Harvestore silo was installed on the Horns' farm in August 1977, and a 20' by 70' Harvestore silo was installed on the Horns' farm on May 19, 1981. The first silo was used to store corn silage and the second silo was used to store haylage. As early as 1983, the Horns knew that: (1) the physical condition of their cows had been deteriorating; (2) the change in the physical condition of the cows was "feed related"; (3) milk production was below the herd's production capability; (4) milk production was continuing to decline, so that by January 1, 1983, Mr. Horn was "questioning" why he was not getting the milk production represented; and (5) they needed to add protein supplement to the herd's feed and thus they would not be able to achieve savings in feed costs as had been represented to them.

The defendants' evidence further shows that Mr. Horn realized in 1983 that his herd was not getting enough protein or energy from the haylage that was stored in the Harvestore silo, and he changed the herd's feed ration. He continued to feed haylage out of the Harvestore until the supply of

stored haylage was depleted, but the haylage constituted only a part of the herd's new ration. After a single filling, the Horns decided not to use the 20' by 70' Harvestore silo to store haylage, even though they had acquired that Harvestore on the basis of written and oral representations that they would save money on feed costs by using the 20' by 70' Harvestore silo as a haylage storage unit. The defendants argue that it was at this time, in early 1983, that the Horns knew or should have known that the 20' by 70' Harvestore silo was not performing as represented and that they had been damaged as a result of the defendants' alleged misrepresentations.

The plaintiffs offer the following facts in support of their contention that the Horns should not have reasonably known before September 1986, the last date within the limitations period, that the defendants' misrepresentations regarding the capabilities of the Harvestore silos were the cause of their damages. According to plaintiffs' Statement of Facts, the Horns were contacted by Mr. Bill Kipfer in the late summer of 1977 regarding the purchase of a Harvestore in which to store corn. Mr. Horn believed that Mr. Kipfer worked for Harvestore (presumably AOSHPI), and not for a local dealer. After the 20' by 50' Harvestore silo was installed in the fall of 1977, the Horns filled it with corn silage. From 1977 to 1981, when a second Harvestore was installed on the Horns' farm, the Horns had no complaints about the quality of the corn silage that had been stored in the first Harvestore silo.

Upon acquisition of the second Harvestore silo in 1981 (a 20' by 70' unit), the Horns used the first Harvestore silo for high-moisture corn, the second Harvestore silo for haylage, and stored their corn silage in a traditional cement silo. However, neither the high-moisture corn nor the haylage stored well in the Harvestore silos and the Horns' dairy herd's rate of milk production decreased. Mr. Horn questioned Mr. Kipfer, who was also a nutritionist, about this production decrease and Mr. Kipfer recommended a change in the herd's rations. Since Mr. Kipfer did not suggest to Mr. Horn that the feed was not keeping well in the Harvestore silos, Mr. Horn concluded that the Harvestore silos were not to blame for the loss of production. Rather, Mr. Horn concluded that haylage simply did not provide enough protein or energy to maintain a high producing herd. Therefore, in order to prevent future losses, Mr. Horn never again used his second Harvestore for storing haylage, but filled it with corn silage. Further, the record shows that Mr. Horn quit using his first Harvestore silo for high-moisture corn in 1989 because, year after year, the high moisture corn did not keep well in the Harvestore silo and he was unable to use the silo throughout the entire year for high-moisture corn as he had planned.

### Joseph and Sharon Dues

The defendants have presented the following evidence with respect to the Dues. The Dues installed their Harvestores in August and October 1981. Soon after they began feeding their dairy herd out of the Harvestore silos, the Dues noticed that milk production was not increasing as had been represented but, rather, milk production began decreasing. Consequently, the Dues immediately began adding protein supplements to their feed. The Dues tried to discontinue the protein supplement from their herd's feed from May of 1982 through October of 1982. During this time period, the herd's milk production again declined, even though the Horns believed that their herd's milk production should have increased within the first 12-month period after using feed from the Harvestore silos. In 1983–84 the Dues realized that they would not be able to discontinue using protein supplements and they began to continuously add protein to the feed. The defendants argue that, in 1983–84 at the latest, the Dues knew or should have known that the feed stored in the Harvestore silos could not, without the addition of supplements, increase or even sustain milk production at the represented level and thus could not save them money on feed costs as had been represented.

The plaintiffs admit that in the fall of 1981, shortly after beginning to feed haylage out of the first Harvestore silo, the Dues stopped using supplements (as recommended) and

their herd's production dropped. Mr. Dues testified in his deposition that his Harvestore salesman told him that the haylage had not been "put up" quite right causing the haylage to be protein deficient. Mr. Dues also testified that the Harveststore salesman told him that his herd needed time to adjust to the different feeding system. In May of 1982, after a new crop of haylage was put into the Harvestore silo, the Dues again stopped adding supplements to their herd's feed. Even though the haylage appeared to be in good condition when it was put into the silo, milk production dropped again shortly after the herd began feeding off of the new haylage. Mr. Dues testified in his deposition that when he reported this fact to the salesmen who sold him the Harvestore silos, the salesmen told him that the hay had been chopped too fine, too long, or too short, or it had been put up at the wrong moisture content, or the cattle were still adjusting. Thus, the Dues always felt that the decrease in milk production was their fault and not the fault of the Harvestore silo. However, the Dues did not have any further contact with anyone associated with either of the defendants after 1985, even though they continued to have problems with their dairy herd.

### Alvin and Rose Timmerman

A 20' by 80' Harvestore silo was installed on the Timmermans' farm on May 12, 1976 and a 20' by 50' Harvestore silo was installed on September 12, 1980. The first silo was used to store haylage and the second silo was used to store high-moisture corn. The defendants claim that the Timmermans knew or should have known as early as 1976–77 that they were not achieving the increased milk production, cash flow, and profits from their first Harvestore as had been represented by the Harvestore salesmen. The defendants have presented evidence that shortly after beginning to feed from their first Harvestore silo, the Timmermans began experiencing poor herd health and a decrease in milk production. The Timmermans knew that their herd needed more protein to stay healthy and to increase milk production. Thus, in 1981 the Timmermans acquired a second Harvestore silo so that they could feed a mixed ration which they believed would give their herd more protein. The Timmermans were told by their Harvestore salesmen that feeding a mixed ration would improve their herd's performance and reduce feed costs. However, even though the Timmermans utilized both Harvestore silos so as to feed a mixed ration, the ration was still protein deficient and the Timmermans had to add supplements to the feed. Thus, the defendants argue that the Timmermans knew by 1981–82 that they were not achieving the milk production increases or feed cost savings as had been represented to them and their fraud claim therefore expired in 1988 making their suit, filed in 1992, untimely.

The plaintiffs, however, claim that for fifteen years the Timmermans made efforts to discover why their dairy herd was experiencing poor health and decreased milk production, but were not able to connect their problems with the feed stored in the Harvestore silos until December of 1991 when they met with lawyers who were experienced in Harvestore litigation. The plaintiffs claim that the Timmermans exercised due diligence in attempting to discover the cause of their problems. Specifically, the Timmermans asked questions about mold in the corn unit, the quality of the feed, the possibility of diseased cows, and the need for computerized feeding equipment. However, there is no evidence in the record that the Timmermans continued to search for the cause of their problems any time beyond 1983. Rather, it appears that the Timmermans soon accepted the fact that the Harvestore silos would not perform as represented and simply continued to add supplements to their herd's feed.

### Walter and Frieda Schwieterman

The Schwietermans had their first Harvestore silo installed in August of 1978. The defendants have presented evidence that by 1980 the Schwietermans were not getting an increase in milk production as had been represented to them. Further, the defendants' evidence shows that the Schwietermans knew within one to two years after acquiring their first silo that they were continuing to need to add supplement to their herd's feed and, therefore, were not saving money on feed costs as had been represented to them. Ad-

ditionally, the evidence shows that the Schwietermans knew by 1981 that their herd was experiencing poor health, in contradiction to the representations made to them that the Harvestore feeding system would improve the health of their herd. Finally, the evidence shows that Mr. Schwieterman found mold in the high-moisture corn stored in the Harvestore silo as early as 1982 and he knew then that something was wrong with the feed.

The plaintiffs, however, argue that the Schwietermans continuously and actively sought the reason for their herd's problems but they were unable to discern that the problems arose from the condition of the feed that was being fed out of the Harvestore silos. Mr. Schwieterman testified in his deposition that when he did not get the increase in milk production that he thought he should get from the Harvestore feed he simply believed that he was doing something wrong. The Schwietermans also considered the possibility that their herd had contracted a disease that was causing them to be in poor health and not produce as much milk. The Schwietermans called upon veterinarians several times to treat various problems such as hoof rot, calving problems, liver problems, dysentery, and scour conditions. The Schwietermans testified in their depositions that the veterinarians never suggested that these problems were feed related, although there is no evidence that the Schwietermans ever specifically asked if the problems were feed related. The evidence shows that the Schwietermans worked with nutritionist Bill Kipfer from 1978 through 1981 in an attempt to formulate a ration that would increase the herd's milk production. The plaintiffs claim that Mr. Kipfer never suggested that the Harvestore feed was incapable of providing the desired results, although Mr. Kipfer consistently advised that the Schwietermans add supplements to the feed, in direct contradiction to representations made to the Schwietermans that they could greatly reduce the supplementation or eliminate it altogether. The evidence in the record also shows that Mr. Schwieterman knew in 1982 and later in 1984 and 1985 that it "was not right" for the ensiled feed to contain mold. However, he "just went ahead and used it".

### Eric and Karen Link

The Links' Harvestores were installed in the summer of 1981. The defendants' evidence shows that the Links began experiencing decreased milk production as early as 1982 and they began adding protein supplements to their herd's feed in early 1983 in order to get the herd's milk production back up. Also, in 1982 the Links began experiencing a deterioration in their herd's health and Mr. Link knew in the spring of 1983 that the feed stored in the Harvestore silos was moldy and smelled rancid. As the mold in the feed became more noticeable, Mr. Link built a grate to catch the mold when unloading feed from the Harvestore silos because he knew that mold was not good for his herd. The defendants thus argue that by 1983 at the latest the Links knew or should have known that the Harvestore silos were not performing as represented and, therefore, the limitations period on their fraud claim began running in 1983 and expired in 1989, well before their suit was filed in November of 1992.

The plaintiffs, however, argue that the Links unsuccessfully undertook diligent efforts to determine the source of their problems. The evidence shows that the Links' herd experienced problems with hoof rot in the early 1980's. Veterinarians were consulted, but they never traced the hoof rot to the Harvestore stored feed. The Links' Harvestore salesmen, Mr. Etchison and Mr. Cox, informed the Links that it was normal for Harvestore fed cows to have problems with their feet because they were eating feed with a higher moisture content which caused looser manure, which in turn caused the cows to have a wetter environment and resultant hoof rot. The Links were advised to "not get excited" about the problem and to "just keep things cleaned up and dry as you can." Also in the early 1980's the Links worked with nutritionists in an attempt to formulate a ration that would improve the herd's health and productivity. The nutritionists never suggested to the Links that their herd's problems arose from the feed stored in the Harvestores. Throughout the 1980's and early 1990's the Links' herd experienced

longer breeding cycles. The Links consulted with their breeders in an attempt to discover the cause of the longer cycles, but none of the breeders ever suggested to the Links that their herd's reproduction problems was caused by the Harvestore feed. As a further attempt to increase their productivity, the Links even purchased a computer feeding system in 1988 so that they could formulate the proper ration for each individual cow.

### Legal Analysis

The defendants have provided the court with several court decisions in which the plaintiffs alleged fraud in connection with their acquisition of Harvestore silos. In the cases cited by the defendants, the courts found that the plaintiffs' claims were barred by the statute of limitations because, even though the plaintiffs may not have actually known of the misrepresentations within the limitations period, the plaintiffs could have easily *discovered* the misrepresentations in a timely manner.

In *Johnston v. Agristor Credit Corp.*, No. 84–4421–S, Slip Op., 1987 WL 348509 (D.Kan. Nov 23, 1987), the Johnstons purchased five Harvestore silos during 1976–78, which were installed during 1976–79. *Id* at 3. The Johnstons first experienced problems with their dairy herd's protein intake and milk production about one month after they began using their first silo which was installed in the early summer of 1976. *Id.* at 5. Soon after the protein problems began, the Johnstons also experienced other problems in their dairy operation. Specifically, breeding problems increased, the feeding process did not become more efficient as had been predicted, and profits fell short of projections. *Id.* In their suit against A.O. Smith, AOSHPI and other defendants, the Johnstons claimed that because of the representations made to them by their Harvestore salesman, they did not suspect that the Harvestore silos were the source of their problems. *Id.* Moreover, the Johnstons' veterinarian could not identify the source of their problems.

In 1984, the Johnstons visited their lawyer's office and discussed their problems with a person familiar with Harvestore litiga-tion and he identified the Harvestore equipment as the source of their problems. Thus, on December 28, 1984, the Johnstons filed suit against A.O. Smith, AOSHPI and others.

In discussing the Johnstons' fraud claim, the court first noted that under Kansas law a cause of action for fraud accrues when the fraud is or reasonably could have been discovered. *Id.* at 13. The Johnstons argued to the court that the misrepresentations made by their Harvestore salesman were not reasonably discoverable until 1984, when they visited their lawyer's office. In considering this argument, the court stated that it was satisfied that the plaintiffs did not actually learn that the Harvestore equipment was the source of their problems until the date they visited their lawyer's office. *Id.* Then the court went on to find that the Johnstons reasonably should have discovered the fraud soon after installing their Harvestore silos, well before the limitations period expired.

> However, [plaintiffs] do not show this court any evidence tending to prove that it was impossible for them to discover [their salesman's] statements were untrue before 1984. On the other hand, defendants show the court that plaintiffs did have reason to know before December 28, 1982 that [their salesman's] representations to them were false. They began experiencing problems with protein content almost immediately. Soon afterwards, the cattle suffered breeding problems and profits dropped. These occurrences were completely adverse to the representations [their salesman] had made. The court recognizes that the plaintiffs did not identify the source of their problem until 1984. The court also acknowledges what every farmer knows: a decrease in production and profitability may be caused by numerous factors, many beyond the farmer's control, and the cause of any decrease is many times hard to isolate. However, when things took a turn for the worse so soon after this major change in the dairy operation, the Harvestore/Slurrystore equipment should have been one of the first things the [plaintiffs] suspected as being the culprit. Certainly over a period of six years (1976–1982) the [plaintiffs] should have at least included

the Harvestore/Slurrystore equipment in a list of possible sources of the problem, and run some checks to confirm or at least rule out their suspicions. It appears from the record that the [plaintiffs] did everything but check their new equipment; such action is not enough to satisfy the requirement that the fraud not be discoverable until December 1982. The court finds that the cause of action for fraud accrued before December 28, 1982, and this action is therefore barred.

*Id.* at 13–14.

The defendants also refer the court to *Agristor Leasing v. Markley*, No. 81–4163, Slip Op., 1984 WL 2817 (D.Kan. June 5, 1984). In *Markley*, the Markleys, as third party plaintiffs, brought suit against third party defendants A.O. Smith, AOSHPI, and others. The Markleys had purchased a Harvestore silo system which was installed on their farm in February of 1979. *Id.* at 2. The Markleys experienced problems with their Harvestore silo as the silo was not airtight as represented and, consequently, the stored grain lost its protein value and spoiled. *Id.* In early 1981, the Markleys ceased using their Harvestore silo system and allowed their Harvestore silos to stand empty. *Id.* at 3.

The Markleys' fraud claims were filed against their Harvestore salesman, Mr. Turner, on March 9, 1983. *Id.* at 2. Mr. Turner requested summary judgment on the fraud claims on the basis that the Kansas statute of limitations for fraud claims (two years at the time the Markleys filed suit) had expired. *Id.* at 3. The Markleys did not dispute that they knew the silos weren't working as represented in late 1980 and early 1981. However, the Markleys argued to the court that they did not know until 1982 that the silo system failed because it wasn't sufficiently airtight. The Markleys argued that since Mr. Turner had represented that the system was airtight and they did not learn that this representation was false until 1982, their fraud claim against Mr. Turner was timely. *Id.* at 4.

The court rejected the Markleys' arguments. The court held that under Kansas law, a cause of action accrues when the plain-tiffs learn that they have been damaged by misrepresentations, not when they learn of the specific defects which caused the damage. *Id.* The court further stated that:

> In the instant case ... the defendants knew that the silo system was not working as allegedly represented before they supposedly found out the precise reason for the malfunction. The statute of limitations began to run at the time defendants learned the silo system was not working and, consequently, that they were damaged by Turner's representations. This was more than 2 years prior to March 9, 1983.
>
> The precise reason for the silo system's poor performance is not essential to defendants' fraud claim; nevertheless it was discoverable with reasonable diligence when the other problems with the system became evident. Indeed, it is unreasonable to believe that defendants did not know immediately that the silo system's problems were caused by excessive oxidation, as distinguished from the specific defect causing the excessive oxidation. Counsel for defendants claims that his clients did not know the importance of sealing air out of the silo. If this were so, they must not have relied upon the assertion that "you could can peaches" in the system. Of course, reliance is an element of fraud.
>
> In oral argument, defendants' counsel commented that new evidence has been discovered which demonstrates Turner's and others' knowledge of inherent defects in the silo system long before the system was sold to defendants. While this evidence is pertinent to the alleged fraud of parties sued by defendants, it does not overcome the limitations defense presented by Turner.

*Id.* at 5–6.

The defendants have also cited *Miles v. A.O. Smith Harvestore Products, Inc.*, 992 F.2d 813 (8th Cir.1993), as additional support for their position. In *Miles*, the district court granted summary judgment in favor of defendants A.O. Smith and AOSHPI on Miles' fraud claims as her claims were not filed within the limitations period. In 1973

Miles and her husband purchased two Harvestore silos in which to store feed for their animals. The silos were represented as being able to store feed for years without the feed becoming contaminated or spoiled. *Id.* at 815. The Harvestore sales representatives who sold the silos to Miles promised that the Harvestore system would yield benefits to Miles' dairy operation, including increased milk production, lower labor and feed costs, and higher profits. *Id.* Miles began using one of the Harvestores in 1974, and in early 1975 she noticed that the feed that had been stored in the silo was contaminated by mold. Harvestore's agents repeatedly attempted to remedy the situation, but the contamination continued to recur. *Id.* Nevertheless, Miles began using a second Harvestore silo in 1981. This silo was filled only once, and by 1982 the feed in the silo was contaminated by mold. *Id.* During the time period that Miles was using feed from the Harvestore silos, her cows experienced sudden death, decreased milk production, spontaneous abortions, and other reproductive problems. *Id.* Both of Miles' silos became so clogged with mold-contaminated feed that she discontinued their use; since 1985 the silos have gone unused, still partially full of feed. *Id.*

Miles brought suit against AOSHPI on August 27, 1991, alleging fraud and conspiracy to defraud. AOSHPI requested summary judgment on the basis that Miles' cause of action was barred by the applicable three-year statute of limitations. Miles presented evidence that Harvestore was aware of the deficiencies in the Harvestore silo system, but continued to sell them. After the sale to Miles, Harvestore continued to send her (and other Harvestore owners) a magazine called "Harvestore Farming/Farmer". This in-house periodical extolled the virtues of the Harvestore silo system, despite Harvestore's knowledge that many users had experience problems with it. *Id.*

The district court granted summary judgment, ruling that Miles' cause of action accrued in 1985 at the very latest, for that was when she abandoned the silos as wholly useless. The district court noted that Miles was aware almost as soon as the silos were installed on her farm that they did not live up to the representations of Harvestore and that there was no effort by Harvestore to conceal Miles' cause of action so as to toll the statute of limitations. The district court found that the facts giving rise to the cause of action were plainly visible from the time Miles put the silos into service, and she had actual knowledge that the representations of Harvestore were false. *Id.*

On appeal, the Eighth Circuit noted that under Arkansas law an action for fraud must be brought within three years from the date the cause of action accrues, which is essentially when the plaintiff discovers the fraud or should have discovered it by the exercise of reasonable diligence. *Id.* at 816. Miles argued on appeal that her cause of action did not accrue until 1990 because she did not become aware that Harvestore had *knowingly* misled her until her son read a magazine article detailing the litigation involving the Harvestore silos. *Id.*

The Eighth Circuit found Miles' argument to be groundless. In affirming the district court's grant of summary judgment, the Court reasoned as follows:

Appellant argues that the district court erred in holding that the magazine that Harvestore provided to her did not conceal her cause of action for fraud from her so as to toll the statute of limitations until 1990 when the truth about the Harvestore silos was revealed to her. The district court held, and we agree, that the representations in the magazine did not rise to the level of affirmative conduct concealing appellant's cause of action from her. Affirmative acts of concealment toll the statute of limitations until the fraud is discovered or should have been discovered with the exercise of reasonable diligence. *Id.* In the present case, Harvestore took no steps to conceal the facts giving rise to appellant's cause of action. It would have been impossible for Harvestore to have done so—the evidence was in appellant's yard, in daily use for the feeding of her animals. Appellant by the exercise of reasonable diligence should have realized that Harvestore had misrepresented the qualities of the silos.

Appellant further argues that the district [court] erred in granting summary judgment because determining when she discovered or should have discovered the fraud allegedly perpetrated on her is a fact question for the jury to decide.... Where, as here, the evidence leaves no room for a reasonable difference of opinion, the district court may resolve fact issues as a matter of law.

*Id.* at 816–17.

In response to the above caselaw cited by the defendants, the plaintiffs refer the court to several cases involving Harvestore litigation in which the courts found that summary judgment was not proper on the issue of the running of the statute of limitations. The plaintiffs first cite *Colglazier v. A.O. Smith Corp.*, No. 28A01–8810–CV–00310, Slip Op., 541 N.E.2d 316 (Ind.App. June 22, 1989). In *Colglazier*, a farmer, Colglazier, had a Harvestore silo installed on his farm in 1974 and he began using silage from the Harvestore silo in January 1976. *Id.* at 2, 541 N.E.2d 316. Colglazier repeatedly experienced problems with his dairy herd including weight loss, decrease in milk production, and death of a significant number of cows. Colglazier suspected that the feed was the source of the problem but did not suspect that the Harvestore silo was the source. *Id.* In early August 1981, Colglazier's Harvestore silo suffered a fire and during an inspection of it afterwards it was discovered that the structure was defective and improperly installed, resulting in improperly cured silage. *Id.*

Colglazier filed suit in August 1983 against Harvestore seeking damages and alleging negligence, breach of warranty, breach of implied warranty of merchantability, strict liability, and fraud. Harvestore moved for summary judgment based upon the two-year statute of limitations for injuries for personal property (I.C. § 34–1–2–2(1)). The Greene Circuit Court granted the motion for summary judgment and Colglazier appealed to the First District of the Court of Appeals of Indiana. The two issues on appeal were stated as:

I. Whether the "discovery rule," under which for the purpose of limitation of actions, a cause of action accrues upon not only the injury and resulting damage but manifestation of the damage and its source, applies in a tort action for damages in which aggrieved persons, having suffered losses from the time of initial use of a product and having diligently sought to determine the cause of those losses, discover more than two years after the purchase and installation of the product that it is the cause of their losses.

II. Whether a court may properly factually determine for purposes of summary judgment, that the owner/operator of a small family-run dairy farm, who inquired of representatives of the retailers and manufacturers of a defective product as to the quality of his silage, and who sought the aid and advice of veterinarians and university-affiliated experts and specialists to determine the causes of his herd's decreased milk production and increased occurrences of illness and death, but received no information indicating that the product could be the source of his problems, knew or should have known that the product was causing his losses.

*Id.* at 2–3, 541 N.E.2d 316.

Colglazier argued on appeal that his cause of action did not accrue until the discovery of the improper installation of the silo in August 1981. Harvestore, however, argued that Colglazier knew, or should have known, that the problems stemmed from the silage for more than two years before August of 1983. The Indiana Court of Appeals, without much discussion, found that both parties' arguments were plausible and further found that the question of when Colglazier's cause of action accrued was fact-sensitive. Consequently, the Court found that the granting of summary judgment was not appropriate. *Id.* at 3, 541 N.E.2d 316.

The plaintiffs also cite *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233 (6th Cir. 1992). In *Van Sickle*, the Van Sickles were dairy farmers who acquired two silos from AOSHPI. The first silo, obtained in 1973 was used for storage of corn, and the other, leased in 1980, was used for the storage of hay. AOSHPI represented to the Van Sickles that the feed stored in the silos would

maintain high protein levels and would have increased nutritional value. *Id.* at 235. AOSHPI also represented that dairy cattle raised on the stored grain would be more productive and healthier than animals fed from other food sources. Additionally, AOSHPI represented that Harvestore fed cows would have an increased production of milk and butterfat, leading to higher profits. *Id.*

The Van Sickles (and the Van Sickle family partnership, West Marion) allegedly relied on AOSHPI's representations when they acquired their silos. After installation of the silos, the Van Sickles soon found that the stored grain did not have enhanced nutritional value and their cows suffered serious health consequences as a result of spoilage of the stored grain, which was moldy and unsatisfactory. *Id.* In October of 1987 the Van Sickles filed a counterclaim against Agristor Financial Corp. for, *inter alia,* fraud and conspiracy to commit fraud. Later the Van Sickles filed a similar complaint against A.O. Smith and AOSHPI. *Id.*

The district court granted A.O Smith's and AOSHPI's motion for summary judgment, finding that the Van Sickles' claims were barred by the relevant statutes of limitations. *Id.* On appeal the Sixth Circuit Court of Appeals noted that Michigan law provides a six-year statute of limitations for fraud actions. The Court noted that the district court had held that fraud claims accrue "at the time the wrong (misrepresentation) upon which the claim is based was done regardless of the time when damage results". The district court thus held that the lease date of the 1980 silo, the date the misrepresentations occurred, initiated the running of the statute of limitations. *Id.* at 236.

After tracing the history of the Michigan statute of limitations for fraud actions, the Court held that the discovery accrual standard applied to the Van Sickles' fraud action. *Id.* at 238. The Court then noted that the district court had failed to use the discovery accrual standard when it ruled on the issue of whether the fraud claim was time-barred. *Id.* at 239. However, the district court did use the discovery accrual standard for purposes of the Van Sickles' claims for fraudu-

lent concealment and RICO violations. Specifically, the district court concluded that "the Van Sickles either knew or should have known by mid–1982 that the silos were not in fact oxygen-limiting.... [T]he undisputed facts known to plaintiff as of 1982, respecting mold, calving problems, protein deficiencies, and the failure of the herd to yield additional milk, establish that plaintiff should have known of the alleged misrepresentation at that time." *Id.* at 239–40.

The Court of Appeals accepted the district court's conclusion that the Van Sickles knew or should have known of the alleged misrepresentation by at least mid–1982. The Court found that the district court's conclusion comported with the evidence submitted by the parties because, although the Van Sickles had experienced serious problems for many years, it was not until mid–1982 that the dairy herd experienced dramatic calf losses as a result of spoiled grain from the silos. The Court then noted that the Van Sickles had submitted sufficient evidence to raise a genuine issue of material fact establishing that a reasonable person might not have known of the alleged fraud prior to mid–1982. The Court then held that the fraud claim was not barred by the statute of limitations because it was filed in October 1987, less than six years after mid–1982, the latest time at which the Court established as a matter of law that the Van Sickles knew or should have known of the alleged misrepresentation. Thus, the Court held that the district court erred by granting summary judgment in favor of A.O. Smith and AOSHPI. *Id.* at 240.

Finally, the plaintiffs have cited *Thiss v. A.O. Smith Corp.,* No. 1:91:CV:239, Slip Op., 1993 WL 771013 (W.D.Mich. June 29, 1993). In *Thiss,* the Thisses were Michigan dairy farmers who began using a Harvestore silo in the fall of 1977 to store their corn. In the fall of 1980, the Thisses began using a second Harvestore silo for storage of their haylage. *Id.* at 2.

At some point after the installation of the second Harvestore silo, the Thisses dairy herd began to suffer health problems. These problems affected production and, therefore profits. The Thisses alleged that when they

recognized these problems they attempted to identify their source. In 1990, they stopped using the Harvestore silos for a trial period, and the health of their herd improved. *Id.*

The Thisses brought suit against A.O. Smith and AOSHPI on March 8, 1991 asserting claims for, *inter alia,* fraud. *Id.* at 3. The district court noted that the Michigan statute of limitations for fraud claims is six years; therefore if the Thisses' claim accrued earlier than March 8, 1985, their claim would be time-barred. The court then recognized that the discovery accrual standard applied to the Thisses' fraud claim, citing *Agristor v. Van Sickle,* 967 F.2d 233 (6th Cir.1992). Thus, the Thisses' claim accrued when a reasonable person might have connected the problems on the dairy farm to the Harvestore silos, and therefore a reasonable person might have known of the alleged fraud.

The court then stated that:

[D]efendants are mistaken when they imply that they must only show when plaintiffs knew that their herd was suffering. The causal connection between the feed storage system and the problems is critical. However, I believe that plaintiffs also are mistaken when they assert that the relevant moment is when they identified the connection between the herd's health and the failure of the silos to limit oxygen intake. The relevant causal connection is between the "problems on the dairy farm [and] the Harvestore silos," *Id.;* the plaintiffs need not know exactly why or how the silos harmed the feed.

*Id.* at 4.

Then, stating that there was a conflict between the parties' experts as to when plaintiffs could have learned about the oxygen damage to their feed through testing, the court held that it could not, as a matter of law, identify the date a reasonable person on the Thisses farm should have recognized the alleged fraud. The court distinguished the Thisses' fact pattern from the fact pattern in *Van Sickle,* wherein the district court and the appellate court both concluded that, as a matter of law, a reasonable person would have discovered the fraud "by mid–1982".

Like the Thisses, the *Van Sickle* plaintiffs noticed a decline in milk and butter fat and reproductive problems. However, unlike the Thisses, the *Van Sickle* plaintiffs noticed a moldy smell emanating from a silo as early as 1974, and had visual confirmation that they were feeding their herd moldy feed. This was the first symptom that directly linked the herd's health and productivity problems with the Harvestore systems. The second link, also missing in the present case, is the *Van Sickle* plaintiff's observation that cows fed from the Harvestore silos tended to produce stillborn calves. Though the two cases share many facts, the trial court's conclusion that the Van Sickle's [sic] should have known about the alleged fraud within two years of the purchase of their second silo relied heavily on these links. (Citations omitted).

In the present matter, although there is a significant amount of evidence concerning the plaintiffs' notice that something was wrong, there is not sufficient evidence linking those problems with the Harvestore systems for me to rule as a matter of law that they should have realized the connection on a particular date. Therefore, resolution of the issue of when a reasonable person would have known of the alleged fraud in the circumstances described above will be left to the jury.

*Id.* at 9–10.

Using the above cases as a framework for analysis, this court will now determine whether each set of plaintiffs in the five pending cases knew or should have known, as a matter of law, that the defendants' fraudulent acts caused them damage prior to the fall of 1986.

The evidence clearly shows that by 1983 Raymond and Joyce Horn knew or should have known that the representations made to them regarding the capabilities of the Harvestore silos were false and they were incurring damages as a result of these false representations. By 1983, in addition to seeing the health of their herd deteriorate, the Horns were experiencing a decline in milk production and were incurring the cost of adding protein supplements to their herd's feed. Moreover, the Horns realized in 1983 that the 20′ by 70′ Harvestore silo would not

keep haylage and they also knew that high-moisture corn did not keep well in the Harve-store silos for more than six to eight months. The Horns have alleged in their complaint that the defendants had represented to them that the higher cost of the Harvestore silo was justified by the fact that the feed produced therein would greatly reduce or eliminate entirely the need for protein supplements. Yet the Horns knew in 1983 that this representation was not true as they found it necessary to add protein to their feed. The Horns have also alleged in their complaint that the defendants represented to them that the use of feed produced by the Harvestore silos would increase milk production. Again, the Horns knew in 1983 that this representation was not true, as they had already experienced a decrease in milk production.

Although the plaintiffs point out that the Horns' nutritionist did not suggest that the feed was not keeping well, there was nothing to prevent the Horn's from discovering this fact. Like the plaintiffs in *Johnston v. Agristor Credit Corp., supra*, the Horns "should have at least included the Harvestore [silos] in a list of possible sources of the problem and run some checks to confirm or at least rule out their suspicions." *Id.* at 13. Unlike the evidence before the court in *Colglazier, supra*, there is no evidence that the Horns inquired of representatives of the retailers and manufacturers of the silos as to the quality of their silage. And, unlike the situation in *Thiss v. A.O. Smith Corp., supra*, there are no conflicting affidavits as to when the plaintiffs could have learned of the damage to their feed. Thus, the court finds that the Horns' cause of action accrued in 1983 at the latest and is barred by the statute of limitations.

Joseph and Sharon Dues also knew shortly after they began using their Harvestore silos that they were not saving money as represented because they needed to add supplements to their herd's feed. The Dues have specifically alleged in their complaint that the defendants had represented to them that the use of the Harvestore silos would greatly reduce or eliminate entirely the need to add protein supplements. It is clear that the Dues knew early on that the defendants'

representations were not true and that they were suffering damages, in the form of lost profits, as a result. The plaintiffs' evidence shows that the Dues' Harvestore salesman placed the blame for low milk production on the quality of the haylage and/or on the fact that the herd was adjusting to new feed. Nevertheless, the Dues should have at least suspected that the silo was not performing as represented when, in May of 1982, they put a new crop of haylage that appeared to be in good condition in the Harvestore silo, stopped using protein supplements, saw that their milk production was declining again, added supplements again in October of 1982, and saw their milk production rise again. *Johnston, supra; Miles, supra*. There is no evidence before the court that the Dues continued to seek the cause of their continuing problems. Rather, they apparently simply accepted the fact that they would have to continue to add supplements. The evidence shows that the Dues did not have any contact with either of the defendants after 1985, thus it is clear that the defendants did not continue to tell the Dues that it was their haylage, or the way it was put up, that was the source of their problems. Consequently, the court finds that the Dues' cause of action accrued no later than 1985 and is, therefore, untimely.

Alvin and Rose Timmerman also knew within one year of using their first Harvestore silo that they were not achieving the profits that had been represented to them. Even in 1982, after using two Harvestore silos so as to feed a mixed ration, the Timmermans had to continue to add supplements to the feed. In their complaint, the Timmermans alleged that the defendants had represented to them that they would not have to add much, if any, protein supplement and would thereby increase their profits. It is clear that the Timmermans knew by 1982, at the latest, that these representations made to them by the defendants were false and they had been damaged as a result. Although the Timmermans insist that they made efforts for fifteen years to discover the cause of their problems, there is no evidence in the record that the Timmermans continued to search for the cause of their problems beyond 1983. *Colglazier, supra*. Accordingly,

the court finds that the Timmermans' cause of action is barred by the statute of limitations.

Walter and Frieda Schwieterman found mold in the high-moisture corn stored in their Harvestore silo as early as 1982. Mr. Schwieterman testified in his deposition that he knew then, as well as in 1984 and 1985, that something was wrong with the feed. The Schwietermans have specifically alleged in their complaint that the defendants represented to them that the construction of the Harvestore silos ensured that virtually no oxygen would enter the silos, thereby eliminating feed spoilage. The Schwietermans have not presented any evidence that would tend to show that, at least by 1985, a reasonable person would not have discovered that the representations made with respect to the Harvestore silos were not true. Like the plaintiffs in *Johnston, supra*, the Schwietermans appear to have done everything to find the source of their problems except check their new silos. "[S]uch action is not enough to satisfy the requirement that the fraud not be discoverable until [the fall of 1986]." *Id.* at 13. Thus, the court finds that the Schwietermans' cause of action is time barred.

Finally, the Links, like the Schwietermans, knew early on that their stored feed was moldy. In fact, Mr. Link built a grate to catch the larger chunks of mold so that his herd would get better feed. The Links also knew, as early as 1983, that the feed smelled rancid. In their complaint, the Links alleged that the defendants had represented to them that feed would not spoil in the Harvestore silos. It is clear that the Links knew in 1983 that the representations made to them were false. Like the Schwietermans, the Links checked everything but the silos when they attempted to find the cause of their problems. After several years of encountering moldy, rancid feed from a silo that was represented to be virtually airtight, the Links should have at least included the silo as a possible source of their problems. *Johnston, supra.* Consequently, the court finds that the Links' cause of action accrued no later than 1983 and is, therefore, untimely.

*Claim of Fraudulent Concealment*

■ In an attempt to toll the statute of limitations, the plaintiffs argue that the defendants engaged in fraudulent concealment of plaintiffs' claims. *See* I.C. § 34–1–2–9 (concealment of facts giving rise to a potential cause of action extends the commencement of the limitations period to the date when there is actual discovery of the cause of action). The court finds the plaintiffs' argument to be completely groundless. Under Indiana law, concealment sufficient to toll the statute of limitations must be active. Mere silence without a duty to speak is not enough. *Morgan v. Koch*, 419 F.2d 993, 998 (7th Cir.1969). Rather, there must have been a "use of trick or artifice designed to prevent inquiry, investigation and discovery or mislead or hinder plaintiff sufficiently to explain the prolonged ignorance." *Id. See also, French v. Hickman Moving and Storage*, 400 N.E.2d 1384, 1389 (Ind.App.1980).

Plaintiffs have cited *Agristor Leasing v. Saylor*, 803 F.2d 1401, 1403 (6th Cir.1986), in support of their position that the defendants fraudulently concealed information from them which may have alerted them to a cause of action. The plaintiffs claim that by affirmatively stating facts which the defendants knew not to be true (that the breather bag system in the silos prevented oxygen from coming into contact with the stored feed), the defendants engaged in fraudulent concealment. A reading of *Saylor*, however, reveals that the issue before the court was whether the district court correctly denied motions for directed verdict and for judgment notwithstanding the verdict insofar as the motions raised limitations issues. Applying Tennessee law with respect to the statute of limitations issue, the Court held that the district court properly denied the motions because there was a sufficient conflict in the evidence concerning when the Saylors knew that they were suffering an injury that was related to the Harvestore feed system. Specifically, Agristor's expert witness testified that Mr. Saylor had told him early on that he knew that there was something wrong with the feed that was coming out of the Harvestore silo. However, the Saylors testified that their salesman told them that there was

"nothing wrong" with the Harvestore. Even if the Court in *Saylor* had found that this statement by the Harvestore salesman constituted fraudulent concealment, there is no evidence in the five cases before this court that anyone ever specifically told any of the plaintiffs that there was nothing wrong with the Harvestore silos at issue. Thus, *Saylor* is not dispositive of this issue.

Plaintiffs also assert that fraudulent concealment occurred as a result of plaintiffs' contacts with representatives of dealers of Harvestore products, and by plaintiffs' receipt of Harvestore publications. As the defendants point out, the undisputed evidence shows that all of the plaintiffs' contacts with sales representatives ended in the early to mid–1980s. And as the defendants further point out, there is no evidence that the defendants in this case engaged in any active conduct that could constitute fraudulent concealment of plaintiffs' causes of action.

Nevertheless, the plaintiffs contend that the defendants undertook affirmative actions which were intended to reflect the product in a positive light and/or deter the plaintiffs from learning the truth about the oxygen-limiting characteristics of the Harvestore silos. However, the evidence simply does not support the plaintiffs' contentions. Even though the plaintiffs may have received Harvestore publications, the representations in these publications do not rise to the level of affirmative conduct concealing the plaintiffs' causes of action. *Miles, supra* at 816. Additionally, this court agrees with the *Miles* court that it would have been impossible for the defendants to conceal the facts giving rise to the plaintiffs' causes of action as the evidence was in the plaintiffs' back yards, in daily use for the feeding of their animals. *Id.*

*Plaintiffs' Breach of Contract Claims (Count II)*

On page seven of their Brief in Opposition to AOSHPI's Motion for Summary Judgment plaintiffs appear to concede that any action for breach of contract for sale must be brought within four years after the cause of action has accrued. *See* I.C. § 26–1–2–725(1)[2] (Indiana's codification of the UCC). However, plaintiffs argue that, in at least some of the cases presently pending before this court, the ten year statute of limitations for contracts set forth in I.C. § 34–1–2–2(6)[3] applies. Plaintiffs argue that since some of the purchase orders for the Harvestore silos were not manually signed by anyone from the dealer, they are by their own terms not a contract and, therefore, the defendants are not entitled to rely on the contract statute of limitations set forth in the UCC.

The plaintiffs' argument is completely without merit for several reasons. First, plaintiffs have taken the position that the purchase orders are not a contract. They cannot in the next breath argue that Indiana's general contract statute of limitations, which applies only to *written* contracts, governs their cause of action. Second, as noted at the end of I.C. § 34–1–2–2 in a paragraph titled "Construction with Conflicting Provisions", to the extent that any of the provisions contained in I.C. § 34–1–2–2 are inconsistent with the provisions in I.C. § 26–1–2–725, the provisions of I.C. § 34–1–2–2 are repealed. Therefore, it is clear that the UCC's four-year statute of limitations for contracts for sale applies, and the general ten year statute of limitations for contracts in writing is not applicable.

Furthermore, as defendants have pointed out, even if the court were to apply the six-

---

**2.** I.C. § 26–1–2–725(1) provides that:
An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one (1) year but may not extend it.

**3.** I.C. § 34–1–2–2(6) provides, in pertinent part, that:
The following actions shall be commenced within the periods herein prescribed after the

cause of action has accrued, and not afterwards:

\* \* \* \* \* \*

(6) Upon contracts in writing other than those for payment of money, and including all mortgages other than *chattel mortgages, deeds of trust,* judgments of courts of record and for the recovery of the possession of real estate, within ten (10) years.

year statute of limitations for contracts *not* in writing, I.C. § 34–1–2–1, it is undisputed that all of the purchase orders and lease agreements were entered into prior to or during 1981, and plaintiffs' contract claims are time-barred.[4]

### Plaintiffs' Breach of Express Warranty Claims (Count I)

■ The statute of limitations for breach of express warranty is set forth in I.C. § 26–1–2–725(1), (2) as follows:

(1) An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one (1) year but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.* (Emphasis added).

Plaintiffs argue that the defendants made an express warranty that the Harvestore silos would prevent oxygen from coming into contact with the stored feed and this express warranty related to the future performance of the product.

Even assuming that the defendants made express warranties to the plaintiffs, it is clear that the four year statute of limitations bars the plaintiffs' action. The representation that oxygen would not come into contact with the stored feed does not "specifically make references to future time" and, therefore, does not fit into the "future performance" exception to the general rule. *Stumler v. Ferry–Morse Seed Co.,* 644 F.2d 667, 671 (7th Cir.1981); *Tolen v. A.H. Robins Co.,* 570 F.Supp. 1146, 1153 (N.D.Ind.1983).

■ Plaintiffs have also asserted that the general contract statute of limitations (I.C.

§ 34–1–2–2) should apply to their express warranty claims because, allegedly, there were no contracts for sale, rendering the UCC's statute of limitations inapplicable. This argument is without merit because the Indiana courts have repeatedly held that where a remote purchaser, such as the plaintiffs herein, asserts a breach of express warranty claim against the manufacturer of a good, the purchaser's claims are governed by the four-year statute of limitation found in Indiana's UCC (I.C. § 26–1–2–725). *Ludwig v. Ford Motor Co.,* 510 N.E.2d 691 (Ind.App. 1987); *Creech v. Southeastern Ind. R.E.M.C., Inc.,* 469 N.E.2d 1237 (Ind.App.1984).

### Plaintiffs' Claims for Breach of Implied Warranties (Count III)

■ Plaintiffs' claims for breach of implied warranties is governed by the four-year statute of limitations set forth in I.C. § 26–1–2–725 and is, therefore, time barred. Additionally, by denying the existence of a contract, the plaintiffs have admitted that they did not have privity with the sellers, a requirement for maintaining a claim for breach of implied warranties. *Prairie Prod. Inc. v. Agchem Div.–Pennwalt Corp.,* 514 N.E.2d 1299 (Ind. App.1987); *Fundin v. Chicago Pneumatic Tool Co.,* 152 Cal.App.3d 951, 199 Cal.Rptr. 789 (1984).

### Plaintiffs' Claims for Strict Liability (Count IV)

■ Indiana Code § 33–1–1.5–5 (the Indiana Product Liability Act) sets out the statute of limitations applicable to all actions in which the theory is strict liability in tort, requiring the action to be brought within two years after the claim has accrued but in any event within 10 years after delivery of the allegedly defective product. *Dague v. Piper Aircraft Corp.,* 275 Ind. 520, 418 N.E.2d 207, 210 (1981); *Amermac, Inc. v. Gordon,* 182 Ind.App. 116, 394 N.E.2d 946 (1979). Applying this statute, plaintiffs' claims of strict liability are clearly time-barred.

Plaintiffs, however, assert that they are not pleading a claim under the Indiana Prod-

---

**4.** Additionally, the notation at the end of I.C. § 34–1–2–1 provides that this section is likewise

repealed to the extent it is inconsistent with I.C. § 26–1–2–725.

uct Liability Act as they are not claiming any of the enumerated damages and, thus, the statute of limitations set out in I.C. § 33-1-1.5-5 are not applicable. Plaintiffs now take the position that their claim in Count IV is actually some sort of breach of contract or breach of warranty claim and that the discovery rule determines the accrual date of their cause of action. As noted earlier, plaintiffs' breach of contract and breach of warranty claims are clearly time-barred. Moreover, insofar as plaintiffs have admitted that they are not claiming any damages in Count IV, plaintiffs have admitted that they cannot prove an essential element of their claim and, therefore, their claim is meritless. *Hinkle v. Niehaus Lumber Co.*, 525 N.E.2d 1243 (Ind. 1988).

### *Defendants' Motion to Strike Affidavit*

The defendants have moved to strike the affidavit of Cheryl Wolf on the grounds that it is not based on her personal knowledge, and contains conclusory opinions and irrelevant information. Wolf's affidavit was submitted to the court by the plaintiffs in response to the defendants' alternative grounds for summary judgment. As the court has found that summary judgment in favor of the defendants is appropriate on statute of limitations grounds, the defendants' motion to strike is now moot.

### *Conclusion*

For all the foregoing reasons, the court finds that all of the plaintiffs' claims are barred by the statute of limitations. Accordingly, the court hereby GRANTS summary judgment in favor of the defendants.