803 F.2d 1401
 Prod.Liab.Rep.(CCH)P 11,160
AGRISTOR LEASING, Plaintiff,
v.
James SAYLOR and Kaaren Saylor d/b/a Udder Nonsense Dairy,
Defendants and Third-Party Plaintiffs-Appellees,
v.
A.O. SMITH HARVESTORE PRODUCTS, INC.; Hermitage Harvestore
Systems, Inc.; and Chuck Dowdy, Third-Party
Defendants-Appellants.
 Nos. 85-5396, 85-5690 and 85-5691.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 22, 1986.
Decided Oct. 21, 1986.
Rehearing Denied Nov. 14, 1986.
 
 Joe E. Manuel, argued, Leitner, Warner, Moffitt, Williams, Dooley, Carpenter & Napolitan, Chattanooga, Tenn., Luther E. Cantrell, Jr., argued, Davies, Cantrell, Humphreys, McCoy, Nashville, Tenn., for third-party defendants-appellants.
 James A. Vick, Malcolm L. McCune, argued, Gracey, Amddin, Cowan & Bird, John K. Maddin, Jr., James A. Vick, Nashville, Tenn., for Saylor et al.
 Before LIVELY, Chief Judge, and KENNEDY and BOGGS, Circuit Judges.
 LIVELY, Chief Judge.
 
 
 1
 In this diversity case the manufacturer, and the dealer and salesman who sold a silo-like structure for storing animal feed, appeal from a judgment for customers whose dairy herd suffered serious losses while being fed from the structure. After preliminary rulings by the district court there remained in the case claims for damages against the manufacturer based on strict liability for manufacturing and distributing a defective product, and against the manufacturer, the distributor and the salesman for fraudulent misrepresentations with respect to the operation of the product. The jury returned joint and several verdicts against all third-party defendants for $1 million in compensatory and punitive damages.
 
 I.
 
 2
 The appellants are A.O. Smith Harvestore Products, Inc. (AOSHPI), the manufacturer; Hermitage Harvestore Systems, Inc. (Hermitage), the dealer; and Chuck Dowdy (Dowdy), the salesman. The appellees are James and Kaaren Saylor, the purchasers of a "Harvestore system" which purported to minimize the amount of oxygen permitted to come into contact with the stored feed.
 
 
 3
 In January or February 1980 the Saylors, operators of a Tennessee dairy farm, were approached by Dowdy about obtaining certain agricultural equipment. Specifically, Dowdy was promoting Harvestore feed storage structures and related equipment manufactured by AOSHPI, for use on the Saylors' dairy farm. The Harvestore system was represented through AOSHPI literature and by Dowdy as "oxygen limiting," designed to keep stored feed virtually airtight, thereby preventing spoilage, yielding better feed and hence increased milk production and butterfat content, and resulting in higher profits. Dowdy allegedly said that "no oxygen" meant "no loss to mold," likening the feed storage process to canning beans in sealed fruit jars. Dowdy also showed the Saylors an AOSHPI film, "The Harvestore System," and a book published by AOSHPI, The Winning System, both of which touted the oxygen limiting capabilities of Harvestore structures. The promotional material defined "oxygen limiting" as "[a] feed storage system in which ensiled feeds are protected from the access of oxygen."
 
 
 4
 In March 1980 the Saylors signed an agreement with Hermitage to obtain the Harvestore system, and in May the Saylors entered a long-term lease with AgriStor Leasing Company (AgriStor), which financed the arrangement. The Harvestore structures were in place and operating on the Saylors' farm by July. After the first month James Saylor began noticing problems in the dairy herd, including depressed milk production, a lack of energy in the cows and swelling in their joints. According to the Saylors, Dowdy repeatedly reassured them that everything was fine. One of the Saylors' own experts, the witness William Russell, testified that James Saylor told him in August 1980 that something was wrong with the feed and that Mr. Saylor thought the problem was the Harvestore. Mr. Saylor testified, however, that in early 1981 he had no idea that the cows' condition was related to the Harvestore system. During 1981 several veterinarians came to the Saylors' farm and examined the dairy herd: the first, brought in by Dowdy, treated the cows for chlamydia; another "could not ascertain" the source of the cows' starvation; a third was "unable to develop any lead whatsoever." Problems with the herd continued, causing lower productivity and in some cases deaths of a number of dairy cows. James Saylor emptied the Harvestore structures for the last time in February 1982 and eventually liquidated the herd. After the Saylors defaulted on their payments AgriStor repossessed the equipment.
 
 
 5
 On October 28, 1983 AgriStor filed suit in the district court against the Saylors, seeking recovery of damages and the balance due under the lease. On January 3, 1984 the Saylors answered and filed a third-party complaint against Dowdy, Hermitage, AOSHPI and another party later dismissed, seeking damages for manufacturing a defective product and for false and fraudulent misrepresentations about the product. At the beginning of the trial the Saylors confessed judgment on the AgriStor claim and the district court granted summary judgment to AgriStore for the remaining payments under the lease. Other rulings by the district court eliminated several claims and the case was tried to a jury on the Saylors' claims of a defective product and fraudulent misrepresentation, and on various defenses raised by the third-party defendants.
 
 
 6
 The appeals were consolidated for oral argument and decision. The parties raised a number of issues in briefs and oral argument, and we have considered all of them, though only three will be discussed in detail.
 
 II.
 
 7
 The first issue requiring extended consideration by this court relates to the district court's handling of the question of limitations.
 
 A.
 
 8
 Throughout the trial the appellants contended that this action was barred by limitations. All parties agreed that the three-year statute of limitations for actions seeking recovery for injury to real or personal property, contained in Tennessee Code Annotated (T.C.A.) Sec. 28-3-105, applies. The Supreme Court of Tennessee has adopted the discovery rule for accrual of tort causes of action:
 
 
 9
 [I]n tort actions, including but not restricted to products liability actions ... predicated on negligence, strict liability or misrepresentation, the cause of action accrues and the statute of limitations commences to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered. All cases contra are overruled.
 
 
 10
 McCroskey v. Bryant Air Conditioning Co., 524 S.W.2d 487, 491 (Tenn.1975) (footnotes omitted).
 
 
 11
 Referring to "the continuing saga of when the statute of limitations begins to run in tort cases," the Tennessee court further defined the "discovery doctrine" by holding that a cause of action does not accrue until the plaintiff has discovered
 
 
 12
 (1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty.
 
 
 13
 Foster v. Harris, 633 S.W.2d 304, 305 (Tenn.1982).
 
 
 14
 At the conclusion of the Saylors' case Hermitage and Dowdy moved for a directed verdict, arguing that James Saylor knew in August 1980 the cause of the injury and the identity of the alleged tortfeasors. AOSHPI joined in this motion. The third-party defendants relied on testimony of the plaintiffs' expert witness, William Russell, a consultant on farm matters:
 
 
 15
 Q I want to know, did Mister--did Mr. Saylor tell you that by early August, the cattle found the haylage and high moisture corn very unpalatable?
 
 
 16
 THE COURT: Did he or didn't he?
 
 
 17
 A Yes, he did.
 
 
 18
 Q All right. And he told you at that time that he knew there was something wrong with this feed that was coming out of there?
 
 
 19
 THE COURT: Did he or did he not?
 
 
 20
 A Yes, he did.
 
 
 21
 THE COURT: All right.
 
 
 22
 Q And he told you that he thought it was out of that Harvestore system, didn't he?
 
 
 23
 A Yes, he did.
 
 
 24
 Q And he told you he knew it at that time?
 
 
 25
 A Yes, he did.
 
 
 26
 Q And he told you that it was costing him about 25 percent of his feed every other day just like what you set out there, didn't he?
 
 
 27
 A That's correct.
 
 
 28
 Q And that's what you base that 25 percent figure on because he said he was having to clean that thing out every other day starting in August of 1980?
 
 
 29
 THE COURT: Is that what you based it on?
 
 
 30
 A Yes, it is.
 
 
 31
 Q And that's what he told you, too, isn't it?
 
 
 32
 A Through theTHE COURT: That's what he told him.
 
 
 33
 Q And so he was aware of his losses beginning at that point in time, wasn't he?
 
 
 34
 A That's what he told me.
 
 
 35
 Q That's exactly what he told you, wasn't it?
 
 
 36
 A That's correct.
 
 
 37
 In opposing the motions the Saylors pointed to evidence that they continued throughout 1981 to seek the cause of the problems they were experiencing with the dairy herd. This evidence consisted of James Saylor's own testimony, that of Mrs. Saylor, and the testimony of two veterinarians that they continued to test the cows in mid-to-late 1981 without determining the cause of their symptoms. The Saylors also testified that Dowdy told them in 1981 that there was "nothing wrong" with the Harvestore equipment and that a mold found in the system was penicillin, which was "good for the cows." This testimony was in support of the Saylors' claim that the cause of the problems had been fraudulently concealed from them. Fraudulent concealment of a cause of action tolls the statute of limitations. Ray v. Scheibert, 224 Tenn. 99, 450 S.W.2d 578, 579-80 (1969).
 
 
 38
 The district court denied the motions for a directed verdict, noting that the Saylors had produced evidence on the time of discovery that was contrary to Russell's testimony. When counsel for Dowdy and Hermitage asked to be permitted to submit a special request for a jury charge on limitations the court agreed to receive it.
 
 
 39
 The motions for a directed verdict were renewed at the close of all the evidence. Referring to arguments centered on the statute of limitations, the district judge responded, "That goes to the jury, though, doesn't it?" Near the conclusion of the conference on jury instructions one of the defense attorneys noted that the court's prepared charge did not include an instruction on the statute of limitations and started to remind the court that it had permitted a special request on this issue. The district judge broke in and stated: "[I]f the jury comes in, does something to you, you'll have to bring it before me one more time." After further discussion of the claim that the appellants had fraudulently concealed the cause of action, the district judge stated again that he would not put the issue to the jury, but would "take it on myself."
 
 
 40
 The district court did not instruct the jury on any aspect of limitations. After a verdict was returned against all third-party defendants, all made motions for judgment notwithstanding the verdict and for a new trial. One ground for a new trial assigned by all appellants was the failure to instruct on the statute of limitations. The post-trial motions were denied without discussion.
 
 B.
 
 41
 We conclude that the district court correctly denied the motions for directed verdict and for judgment notwithstanding the verdict insofar as the motions raised limitations issues. However, we conclude further that the district court committed reversible error in failing to submit these issues to the jury. The Saylors filed their claim for damages as a third-party complaint on January 3, 1984. As the district court noted in denying the motions for a directed verdict, there was a conflict in the evidence as to when the Saylors knew that they were suffering injury that was related to the Harvestore feed system. If the jury accepted Russell's testimony that James Saylor told him in August 1980 that his losses were caused by the feed that was coming out of the Harvestore structure, this finding would have supported a judgment for the appellants on the ground that the claim was filed more than three years after the cause of action accrued. On the other hand, if the jury accepted the Saylors' assertions that they did not know the cause of the problem with the cows until well into 1981, and beyond, limitations would not have been a factor. As it was, the jury was not aware that the date of filing the third-party complaint had any significance.
 
 
 42
 It would have been appropriate for the district court to have submitted the issues related to the statute of limitations to the jury in interrogatories along with forms for a general verdict. Rule 49(b), Fed.R.Civ.P. The jury's responses to interrogatories would have supplied the district court with the information required for a determination of whether or not the Saylors' action was barred. The district court's failure to require the jury to make a determination of when the Saylors knew "the occasion, the manner and the means" by which the injury to their property occurred, and the identity of the tortfeasor, Foster, 633 S.W.2d at 305, had the effect of directing a verdict in favor of the plaintiffs on the limitations issues. The defendants are entitled to a new trial.
 
 III.
 
 43
 The appellants contend that they are not liable to the Saylors on the claim of fraudulent misrepresentation because of disclaimers contained in the contract of sale for the Harvestore system. They rely on the following terms of the contract:
 
 
 44
 * * *
 
 
 45
 * * *
 
 
 46
 10. The Seller hereunder is an independent contractor none of whose representations are binding on the Manufacturer.
 
 
 47
 * * *
 
 
 48
 * * *
 
 
 49
 14. Preamble--Buyer understands the conditions of the use of the products and is not relying on the skill or judgment of the Manufacturer or Seller in selecting them because Buyer acknowledges that farming and livestock feeding results are very much the products of individual effort combined with various climatic, soil, water, growing and feeding conditions which are beyond the control of the Manufacturer and Seller. Buyer recognizes that any advertisements, brochures, and other written statements which he may have read, including any farm profit plan which may have been shown to him, as well as any oral statement which may have been made to him, concerning the potential of the Harvestore and or Slurrystore units and allied machinery and equipment, are not guarantees and he has not relied upon them as such because the products will be under Buyer's exclusive management and control....
 
 
 50
 * * *
 
 
 51
 * * *
 
 ACKNOWLEDGEMENT AND RELIANCE
 
 52
 I HAVE READ AND UNDERSTOOD THE TERMS AND CONDITIONS OF THIS PURCHASE ORDER INCLUDING THE WARRANTIES, DISCLAIMERS AND TERMS AND CONDITIONS HEREIN GIVEN TO ME, EITHER BY THE MANUFACTURER OR THE SELLER. I RELY ON NO OTHER PROMISES OR CONDITIONS AND REGARD THAT AS REASONABLE BECAUSE THESE ARE FULLY ACCEPTABLE TO ME.
 
 
 53
 James Saylor acknowledged at trial that he and his wife read, understood and signed the agreement, including the disclaimer provisions.
 
 A.
 
 54
 The appellants argue that the disclaimers are binding, and that as a matter of contract law the Saylors were precluded from claiming that they relied to their detriment on the publications of AOSHPI or the oral representations of Hermitage and Dowdy. They rely on two Tennessee cases and one from a federal district court in Georgia. See Tartera v. Palumbo, 224 Tenn. 262, 453 S.W.2d 780, 785 (1970) ("[P]laintiffs will be given an opportunity to prove their allegations, which are sufficient to establish a case in the absence of contributory fault, adequate disclaimers, or other defenses.") (emphasis added); Jasper Aviation, Inc. v. McCollum Aviation, Inc., 497 S.W.2d 240, 243 (Tenn.1972) (quoting and following Tartera ); Gibson v. Home Folks Mobile Home Plaza, Inc., 533 F.Supp. 1211, 1221-22 (S.D.Ga.1982) (under Georgia law a comprehensive merger and disclaimer clause may foreclose a fraud action by negating the element of reliance on the misrepresentation).
 
 
 55
 The Saylors rely on Tennessee cases that determine the effectiveness of disclaimers according to whether recovery is sought for breach of warranty or for tortious misrepresentations. In Cooper Paintings & Coatings, Inc. v. SCM Corp., 62 Tenn.App. 13, 457 S.W.2d 864 (1970), the plaintiff sought recovery for alleged "breach of express and implied warranties and/or misrepresentation of the fitness and suitability" of a product. There was a notice, "no warranties," on the container label. In disposing of a defense based on this disclaimer, the court stated:
 
 
 56
 Plaintiff's alternative theory is based upon public material misrepresentations of the character and quality of the defendant's products. In cases based upon misrepresentation rather than express or implied warranty, privity of contract is not required nor is a disclaimer of liability by the seller effective. Ford Motor Co. v. Taylor, [60 Tenn.App. 271, 446 S.W.2d 521 (Tenn.App.1969) ].
 
 
 57
 Id. at 867 (emphasis added).
 
 
 58
 The United States District Court for the Eastern District of Tennessee has construed Tennessee law to hold that disclaimers are ineffective to limit liability for misrepresentations. Walker Truck Contractors, Inc. v. Crane Carrier Co., 405 F.Supp. 911, 917 (E.D.Tenn.1975). See also Vicon, Inc. v. CMI Corp., 657 F.2d 768, 775 (5th Cir.1981) (applying Tennessee law).
 
 
 59
 It appears that dicta in Tartera and Jasper Aviation, Inc., support the appellants whereas the holdings in Cooper Paintings and Walker Truck support the Saylors. The district court followed Cooper Paintings and Walker Truck, treating the disclaimers differently insofar as they applied to warranties and to misrepresentations. The court granted partial summary judgment to AOSHPI, Hermitage and Dowdy on the ground that all implied warranties were specifically excluded by "appropriately worded, conspicuous disclaimers." However, the court refused to give effect to the disclaimers of reliance and submitted the tortious misrepresentation claims to the jury.
 
 
 60
 The interpretation of state law by a district judge sitting in a diversity case is entitled to considerable deference. Our statement in a recent diversity case from Kentucky is applicable to the present appeal:
 
 
 61
 [T]he experienced district judge who heard and decided this case, himself a former state judge in Kentucky, found support for his decision on both issues in Kentucky cases. In this situation we follow the rule enunciated by Judge Shackelford Miller, Jr. in Rudd-Melikian, Inc. v. Merritt, 282 F.2d 924, 929 (6th Cir.1960):
 
 
 62
 But the rule appears well settled that in diversity cases, where the local law is uncertain under state court rulings, if a federal district court judge has reached a permissible conclusion upon a question of local law, the Court of Appeals should not reverse, even though it may think the law should be otherwise. As said in a number of cases, the Court of Appeals should accept the considered view of the District Judge.
 
 
 63
 Louisville and Jefferson County Metropolitan Sewer District v. Travelers Insurance Co., 753 F.2d 533, 540 (6th Cir.1985).
 
 
 64
 Judge Thomas Hull, who presided over this trial, was a Tennessee circuit judge prior to his appointment to the federal bench and engaged in private practice in Tennessee for more than 20 years. We conclude that the district court did not err in denying summary judgment and a directed verdict on the basis of the disclaimers of reliance.
 
 B.
 
 65
 For some reason AOSHPI framed its argument on the disclaimer issue in terms of the district court's refusal to include its "Request No. 11" in the jury charge. That request proposed that the jury be instructed as follows:I charge you that it is the law of this state that one is under a duty to learn the contents of a written document before he signs it. If, without being the victim of fraud, he fails to read the document or learn what it states, he signs the document at his own risk, and will be conclusively presumed to know the contents of the document and must suffer the consequences of his own negligence.
 
 
 66
 Furthermore, it will not do for a man to sign a document, and, when called upon to respond to his obligations, decide that he did not read it when he signed it, or did not know what it contained. If this were permitted, documents would not be worth the paper upon which they are written.
 
 
 67
 The request was properly refused. The Saylors admitted that they read the document and understood its meaning. There was no need for the jury to presume that they knew the contents; this fact was established. The only issue was whether the appellants fraudulently misrepresented the product and this issue was covered adequately in the instructions that were given.
 
 IV.
 
 68
 The appellants maintained in the district court that there was no basis in the proof for an award of punitive damages. The district court denied motions for a directed verdict and for judgment notwithstanding the verdict on this issue and the jury assessed punitive damages of $308,995 against the appellants jointly.
 
 A.
 
 69
 Tennessee permits an award of punitive damages for "fraud, malice, gross negligence or oppression." Inland Container Corp. v. March, 529 S.W.2d 43, 45 (Tenn.1975), citing Knoxville Traction Co. v. Lane, 103 Tenn. 376, 53 S.W. 557 (1899). The district court's charge to the jury clearly instructed that punitive damages could be awarded only against those third-party defendants found to have made fraudulent misrepresentations. Thus, the question is whether there was sufficient evidence of such misrepresentations for this issue to go to the jury. We conclude that the evidence was sufficient to require submission of the punitive damages issue to the jury.
 
 
 70
 Twice during the trial the district court asked the Saylors' counsel what evidence there was of fraud to support the claim for punitive damages. On each occasion counsel stated that the third-party defendants told the Saylors that spoilage was not a problem with the Harvestore system--no oxygen, no mold; furthermore, the third-party defendants knew that various studies showed that the system was "uptaking" oxygen at a rate far above that required for visible mold growth.
 
 
 71
 The evidence which supported counsel's statements is essentially as follows: James Saylor testified that Dowdy first came out to the farm in January or February 1980, bringing promotional materials for the Harvestore system. Dowdy sat down with the Saylors and worked out on paper how much the Saylors were losing and how much they would gain by using the Harvestore system. According to James Saylor, Dowdy said that with the Harvestore system there was no oxygen and therefore no loss to mold, likening the process to canning beans in sealed fruit jars; that the Saylors could produce more feed on less ground with the Harvestore; that the Saylors would save enough money to pay for the system and then some; that he guaranteed an increase of three to six pounds in milk production; and that the Saylors would have a $55,000 surplus at the end of the year. Dowdy showed the film "The Harvestore System" and the book The Winning System, published by AOSHPI. James Saylor testified that he was especially impressed with the oxygen limiting capabilities of the Harvestore. Mr. Saylor also said that Dowdy came frequently to the farm to monitor the use of the system, finding no problems. James Saylor stated that he began noticing problems after the first month, with a decline in milk production, the cows' loss of energy and their apparent sickness; Dowdy reassured them.
 
 
 72
 Kaaren Saylor also testified about Dowdy's representations. She said that Dowdy told them that they could expect $57,924 per year in savings with the Harvestore (she relied in part on notes made during Dowdy's visits), with profits resulting primarily from increased milk production. Dowdy said that no oxygen would reach the feed, using the canning fruits and vegetables analogy. Some "documents," according to Mrs. Saylor, supported Dowdy's assertions. Mrs. Saylor testified that based on this information she and her husband decided to go with the Harvestore system. The Saylors noticed cows getting sick "over the next few months," with Dowdy frequently coming out to the farm to check on progress.
 
 
 73
 The Saylors' witness William Wallace Smith, Jr., an AOSHPI vice-president of product engineering, had the following exchange during his deposition, which was read into evidence:
 
 
 74
 Q Now, does, to your knowledge, Harvestore represent that the breather system prevents oxygen from coming into contact with the feed?
 
 
 75
 A Of course, not.
 
 
 76
 Q If that representation was made, it would be a false representation, I take it, based upon your judgment?
 
 
 77
 A Yes.
 
 
 78
 Smith also testified about the "dome" oxygen problem (the dome is in the bottom of the structure, next to the unloader) and referred to a January 1982 memo and a meeting on the subject. According to Smith, the marketing department told him that feed spoilage due to mold growth in the dome led to numerous complaints.
 
 
 79
 Robert Zoyiopoulous, an engineering consultant, also testified for the Saylors. Responding to the glossary definition of "oxygen limiting" contained in The Winning System the witness said: "My opinion is it is not oxygen limiting under that definition." Responding to an AOSHPI brochure statement that "[t]he Harvestore system breathes, too, but its patented design prevents oxygen from coming into contact with the feed" he also stated, "It's false," and referred to unidentified AOSHPI "studies" indicating their knowledge that that statement is false. According to Zoyiopoulous, in a concrete silo (which the Saylors had previously) the silage exposed to oxygen is removed on a daily basis, but in the Harvestore system that feed is not removed, because of a design defect. The witness's conclusion was that the Harvestore was not oxygen limiting, but oxygen enhancing, making all Harvestore structures inherently defective. Finally, Zoyiopoulous pointed to a 1967 document from the director of engineering for AOSHPI noting how much oxygen enters the structure with each unloading, and noting probable detrimental effects on the preservation of feed.
 
 
 80
 The district court did not err in permitting the jury to consider an award of punitive damages.
 
 B.
 
 81
 Hermitage and Dowdy make a separate argument with respect to punitive damages. The Saylors introduced evidence of the financial condition of AOSHPI, but not of these appellants. They contend that punitive damages may not be awarded against a party whose financial condition has not been established. That is the rule in Tennessee except where several defendants are sued jointly. In Odom v. Gray, 508 S.W.2d 526 (Tenn.1974), the Supreme Court answered the following question in the affirmative:
 
 
 82
 Can punitive damages or "smart" money be awarded against joint or multiple defendants when the financial worth of only one defendant is introduced into evidence?
 
 
 83
 In Huckeby v. Spangler, 563 S.W.2d 555, 558 (Tenn.1978), the court construed Odom to hold that "in an action against more than one defendant, in which punitive damages are claimed against all, it is permissible for the plaintiff to introduce evidence of the net worth or assets of one of the several defendants, and that a jury verdict based thereon is proper."The district court did not err in allowing punitive damages to be assessed against Hermitage and Dowdy.
 
 V.
 
 84
 We have examined all other claims of error carefully and find none of them meritorious. The Saylors filed a notice of appeal but did not make any arguments in support of a cross-appeal, either in brief or at the hearing. The judgment of the district court is reversed and the case is remanded for a new trial. No costs are allowed on appeal.
 
 
 85
 BOGGS, Circuit Judge, concurring.
 
 
 86
 I concur in the judgment of the Court because I agree that a new trial is required for the reasons set forth in Judge Lively's opinion. I concur specially, however, to emphasize my view on the effect of the contractual disclaimer.
 
 
 87
 To begin, I see a clear distinction between a disclaimer of liability and a disclaimer of reliance. The former is a direct attempt to avoid legal consequences; the latter is an attempt to establish a fact. The cases that this Court and the district court have cited, and relied upon, are cases involving disclaimers of liability. As this Court and the district court pointed out, such disclaimers are disfavored in Tennessee. The issue in the instant case, however, involves the effect of an apparent disclaimer of reliance.
 
 
 88
 Appellants argue that the district court should have granted their motion for judgment notwithstanding the verdict, because of the effect of a contractual disclaimer of reliance. They support their disclaimer-of-reliance argument by citing Gibson v. Home Folks Mobile Home Plaza, Inc., 533 F.Supp. 1211, 1221-22 (S.D.Ga.1982), where a federal district court applying Georgia law held that a disclaimer of reliance may negate an element of fraudulent misrepresentation. I find this case to be relevant, persuasive, and consistent with Tennessee law. Reliance is, under Tennessee law, one of the five essential elements of an action for fraudulent misrepresentation; where a defendant can establish that plaintiff did not rely upon the misrepresentations, the action cannot stand. See Williams v. Van Hersh, 578 S.W.2d 373, 376 (Tenn.App.1978) (citing Whitson v. Gray, 40 Tenn. 441 (1859)). I find no reason that a contractual disclaimer of reliance cannot be used as evidence on the issue of whether the plaintiff had relied upon the misrepresentations.
 
 
 89
 Furthermore, I believe that a contractual disclaimer of reliance may be competent evidence on the issue of whether the plaintiff had relied upon alleged misrepresentations, because a rule to the contrary would allow a person to enter into a commercial bargain, sign a contract containing an explicit term describing what that party did and did not rely upon in entering into the agreement, and then be relieved of any responsibility for that term when it later suited him. To illustrate, imagine what would have occurred had the Saylors paused just before signing the contract, declared that they didn't like the reliance-disclaimer clause, and insisted upon a contractual term stating explicitly that they relied upon all of the representations made in promotional literature and all of the representations made by the salesman. I can hardly imagine that, under those circumstances, the transaction would have gone forward unimpeded. Both my sense that the above-described scenario would endanger the deal and my conclusion that a disclaimer of reliance may be used to show that a plaintiff did not rely on particular representations, stem from the fundamental doctrine of Contracts that honors lawful, consensual, informed commercial agreements. I see no reason that this doctrine should disappear in the presence of an allegation of fraudulent misrepresentation.
 
 
 90
 Here, the Saylors admit that they read and understood the contract. This, coupled with a determination that the contract contained a valid disclaimer of reliance, may be enough, in the absence of some competent evidence to the contrary, to justify granting a motion for judgment notwithstanding the verdict on this issue. However, appellants attempted to present this issue to the district court only in their requested jury instruction No. 11 and in their motion for judgment notwithstanding the verdict; neither properly presented the issue to the district court. As the majority opinion correctly states, the requested jury instruction only addresses points not actually in dispute. Similarly, appellants' motion for judgment notwithstanding the verdict raises only the issue of whether the contract "disclaims or bars any recovery for any alleged misrepresentations."[1] The district court cannot be faulted for failing to grant appellants' motion for judgment notwithstanding the verdict on the basis of the disclaimer of reliance where that issue was not clearly raised before that court.
 
 
 
 [1]
 The section of appellants' motion for judgment notwithstanding the verdict that appears most nearly to raise the issue of the effect of the disclaimer of reliance is paragraph 12 where appellants contend "[t]hat the verdict is contrary to the contract signed by the Saylors, which the plaintiffs admitted they read and signed, and which disclaims or bars any recovery for any alleged misrepresentations." J.A. at 197