The **GOODYEAR TIRE & RUBBER COMPANY, Plaintiff,**

v.

**CHILES POWER SUPPLY, INC., dba Heatway Systems, Defendant.**

No. 5:97CV335.

United States District Court, N.D. Ohio, Eastern Division.

June 3, 1998.

Orville L. Reed, III, David P. Bertsch, Betty Joan Konen, Karen K. Grasso, Buckingham, Doolittle & Burroughs, Akron, OH, James K. Archibald, Melissa Force, Venable, Baetjer & Howard, Baltimore, MD, for Plaintiff.

Sergio Anthony Carano, Duvin, Cahn & Hutton, Cleveland, OH, Robert A. Goodman, James S. Wertheim, Drew A. Carson, Goodman, Weiss, Miller, Cleveland, OH, Randall S. Herrick–Stare, Walberg & Dagner, Englewood, CO, for Defendant.

## ORDER

SAM H. BELL, District Judge.

Now before the court is a motion for summary judgment filed by Plaintiff Goodyear Tire & Rubber Co. (Docket #114.) In its motion and memoranda in support thereof, Goodyear argues that there are no genuine issues of material fact relevant to each of its claims against Defendant Chiles Power Supply, Inc., dba Heatway Systems ("Heatway"). As a result, Goodyear further argues, it is entitled to judgment on these claims as a matter of law.

These claims, as well as counterclaims brought by Heatway which are not the subject of this order, arise from a series of contracts between Goodyear and Heatway for the supply of rubber hose used in hydronic radiant heating systems. Goodyear's motion requires that the court consider fundamental questions under Ohio law concerning the formation of contract rights, as well as their application. For the reasons that follow, the court finds that Goodyear is entitled to summary judgment on its claims, but only in part. This court has jurisdiction over this case pursuant to its diversity jurisdiction under 28 U.S.C. § 1332.

### I.

Heatway is a Missouri manufacturer of hydronic radiant heating systems. These systems are embedded in either outdoor pavement or indoor flooring, and include pipes, tubes or hoses which circulate warm fluid. As the fluid travels throughout the system, it transfers heat to the surrounding material. Customers purchase hydronic radiant heating systems for various uses, from melting snow on a driveway to warming the floor tiles of a bathroom.

Heatway has sold its heating systems since 1985. Heatway initially used fixed piping to circulate fluid throughout its system. But in contrast to some of its competitors, Heatway later decided that flexible rubber hose was superior as a fluid conduit. Thus, it began purchasing hose from various companies, and in 1988 approached Goodyear about supplying the rubber hose it wanted for its finished products. Goodyear is an Ohio manufacturer

of diversified rubber products. Approximately one year later, the parties reached an agreement, and Goodyear began supplying Heatway with Entran II rubber hose. In 1995, Heatway switched to Entran III hose, which Goodyear continued to supply.

Entran II was designed in response to Heatway's plastic pipe-based competition. These competitors claimed that rubber hose was more susceptible to oxygen transfer across the hose membrane, thereby increasing the likelihood that a heating system's metal components would corrode. To answer these claims, Heatway sought the superior oxygen protection of an Entran II hose designed with a nitrile inner tube and chernivic outer cover. Subsequently, Heatway converted to the Entran III hose, which has an ethylene propylene diene monomer ("EPMD") tube and a hypalon cover.

The parties bitterly dispute exactly what representations were made during the negotiations which in the purchase of rubber hose. According to Heatway, it entered the negotiations as a relative neophyte in the world of rubber hoses. It approached Goodyear, a recognized world leader in rubber products, with only a general idea of what it wanted in and from the rubber hose. Heatway knew only that it wanted a flexible hose to carry warmed fluid. It wanted hose which could either be embedded in concrete or installed under floors. Furthermore, it wanted the hose to last twenty years or more, and to be suitable for general hydronic radiant heating applications. These simple goals, says Heatway, were expressly made known to Goodyear.

In Heatway's view, Goodyear, with full knowledge of Heatway's intended applications, Goodyear promised to deliver a hose that would meet all of Heatway's expectations, and more. Heatway further claims that Goodyear made these promises, however, despite knowing full well that the Entran II hose, as proposed, was prone to hardening, cracking, and leaking. These problems had the potential to inflict enormous damages that would cost untold sums to repair.

Not surprisingly, Goodyear tells a very different story. Its story begins with Heatway's founders, brothers Mike and Dan Chiles. The Chiles brothers initially sold heating systems which used fixed, inflexible tubing. But seeking greater flexibility, the brothers switched Heatway's systems to rubber hose which included an inner tube made of EPMD. That tubing, however, also disappointed Heatway, because of its relatively high rate of oxygen permeation. As a result, Heatway worked with another hose supplier, Dayco Rubber Company ("Dayco") to develop a hose that was not only flexible, but included an inner tube made of styrene enthdiene rubber ("SBR"). SBR, like nitrile, has a lower oxygen permeation rate than EPDM. The end product of these design efforts was the Entran II hose.

In July 1986, the Chiles brothers applied for a patent for a flexible hose heat exchange construction. The application disclosed a system for transferring heat that, in Goodyear's opinion, reveals a sophisticated knowledge of tubing composition and properties. On October 5, 1988, the United States Patent and Trademark Office granted the brothers a patent for the construction, United States Patent Number 4,779,673.

Just before the patent was granted, Heatway contacted Goodyear about supplying Entran II hose. Then, on March 3, 1989, after discussing the particulars of Heatway's requirements, the parties agreed to a set of ten performance specifications for any Entran II supplied by Goodyear. In addition, Heatway insisted that the hose include nitrile inner tubing.

The parties also discussed the warranty that would apply to any Goodyear Entran II hose. As did its competitors, Heatway sought to assure its customers that the rubber hose would last at least twenty years. Goodyear, however, knew that it could not reasonably guarantee any such performance. It insisted, and Heatway ultimately acknowledged, that it would warrant only the hose's material and workmanship. Goodyear put its position in writing, declaring that

[a]ll such products sold by The Goodyear Tire & Rubber Co. are warranted to be free from defects in material and workmanship but such products are not warranted for any particular purpose, applica-

tion or use.... Goodyear's responsibility shall not exceed the original purchase price of the product claimed to be defective, and in no event shall Goodyear be responsible for special, incidental or consequential damages.

Other than those specifically set forth herein, there are no warranties which extend beyond the description of the products on the face hereof, either express or implied. No representative has authority to make any representation, promise or agreement, except as stated herein.

(Alfredson Letter, Pl.'s Ex. 19.) In addition, Goodyear included its warranty in its standard terms and conditions, as set forth on the invoice accompanying every delivery of hose.

In any event, both parties agree that between 1989 and 1993, Heatway purchased Entran II hose from Goodyear for a total price of approximately $8 million. Subsequently, Heatway began purchasing Entran III hose as a substitute conduit for its radiant heating systems. Between 1995 and 1996, Heatway purchased over $2 million worth of Entran III hose for which it has not yet paid Goodyear. In its complaint, Goodyear asks this court to find that it is entitled to payment on its 1995 and 1996 sales to Heatway of Entran III hose. It also asks that the court declare that its warranty on Entran II hose:

(1) limits the liability of Goodyear to repair or replacement of the hose for defects in the hose's material or workmanship, at a cost not to exceed the original purchase price of the hose;

(2) excludes all other warranties, either express or implied; and

(3) excludes claims for special, incidental or consequential damages.

## II.

In general, when considering a party's motion for summary judgment, a court must establish whether the nonmoving party can present evidence sufficient to support a reasonable verdict in its favor. In *Hall v. Tollett,* 128 F.3d 418, 422 (6th Cir.1997), the Sixth Circuit Court of Appeals explained the standard for summary judgment under Fed. R.Civ.Pro. 56 as follows:

[a] court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Under this test, the moving party may discharge its burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." The nonmoving party cannot rest on its pleadings, but must identify specific facts supported by affidavits, or by depositions, answers to interrogatories, and admissions on file that show there is a genuine issue for trial. Although [the court] *must draw all inferences in favor of the nonmoving party,* it [the non-moving party] must present significant and probative evidence in support of its complaint. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

(citations omitted). The court shall proceed to consider Goodyear's motion with this standard in mind.

### III.

#### A.

Goodyear first moves that the court enter judgment as a matter of law on its Entran III claim. In that claim, Goodyear seeks compensation for all shipments of Entran III hose between 1995 and 1996 for which Heatway has not yet paid. According to Goodyear, this amount now total $2.3 million, including interest.

 Heatway does not dispute that it has yet to pay for various shipment of Entran III hose. But it does dispute its obligation to make such payments. To begin, Heatway asserts that it had a single requirements contract with Goodyear. Specifically, Heatway asserts that Goodyear agreed to supply it with all the hose it required for its heating systems. Furthermore, it asserts that Good-

year breached its duty under the contract when it supplied defective Entran II hose from 1989 to 1993. As a result, Heatway argues, it is entitled to a set-off for any damages it might owe on the Entran III shipments equal to the damages inflicted by Goodyear in supplying defective Entran II hose. *See* Ohio Rev.Code § 1302.91 (West 1998) ("[A] buyer may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.")[1]; *cf. Pacific Western Resin Co. v. Condux Pipe Sys., Inc.*, 771 F.Supp. 313 (D.Or.1991) (finding that triable issue of material fact remained as to whether buyer could set off damages for breach of requirements contract). Heatway also argues that it is entitled to a set-off for certain defects in the Entran III hose. Finally, it argues that even if Goodyear is entitled to damages on the Entran III contracts without any set-off, Goodyear is not entitled to a final judgment on its claims. After all, says Heatway, the court must still consider Heatway's pending counterclaims on the Entran II contracts, and an award on those claims might minimize or even eliminate the amount due on the contracts for Entran III.

■ The court must first consider Heatway's assertion that it and Goodyear were intended parties to a single requirements contract. Under Ohio law, it is the intent of the parties which governs the enforceability of contracts. *See, e.g., TRINOVA Corp. v. Pilkington Bros.*, 70 Ohio St.3d 271, 276, 638 N.E.2d 572 (1994).

A requirements contract is a contract which calls for one party to furnish materials or goods to another party to the extent of the latter's requirements in business. UCC 2–306(1), as adopted by Ohio, sets forth the standard for a requirements contract: A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably

disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded. Ohio Rev.Code Ann. 1302.19(A) (Baldwin 1988).

*Cyril Bath Co. v. Winters Indus.*, 892 F.2d 465, 467 (6th Cir.1989). In *Cyril*, the plaintiff agreed to provide aluminum tubes to the defendant for use in the defendant's construction of an engine intake manifold assembly. In its offer, the plaintiff stated that its prices were based on a "three year program with annual production requirements" of 800,000 tubes in each of the first two years and 400,000 tubes in the third year. But after accepting shipments from the plaintiff for two years, the defendant informed the plaintiff that it would require no more orders of tubes. Subsequently, the plaintiff sued for damages based on it lost profits. The district court held that the defendant had breached the contract, and calculated damages based on its finding the contract was a requirements contracts under UCC § 2–306(1). On appeal, the district court affirmed the district court's finding. "Cyril Bath argues that the agreement was not a requirements contract because Winters did not promise to purchase tubes exclusively from Cyril Bath. We find this argument unpersuasive. A promise to purchase exclusively from one supplier may be either implicit or explicit." *Id.*

In this case, Heatway offers no evidence to suggest that a single contract bound Goodyear to supply Heatway with all the rubber hose which Heatway in good faith required. Alternatively, Heatway points to various objective characteristics of its relationship with Goodyear, and argues that they are precisely what one would see in a relationship governed by a single requirements contract. For example, Goodyear produced and stockpiled large quantities of hose based on Heatway's projected sales. (Dan Chiles Decl., Def.'s Ex. 9, ¶ 5.) Goodyear also sent each

---

**1.** The parties, as well as the court, agree that the Ohio law governs all substantive issues in this case. *See Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (holding that a federal district court sitting in diversity must apply its forum state's choice of law rules); Ohio Rev.Code § 1301.05 (providing that Ohio law applies to all "transactions bearing an appropriate relation to" Ohio).

shipment of hose to Heatway in a "just-in-time" fashion, under identical terms and conditions. (*Id.*) Moreover, no other manufacturer supplied hose to Heatway during the period at issue. (*Id.*)

Nevertheless, there is no evidence of a promise by Heatway to purchase its hoses exclusively from Goodyear, as *Cyril* requires. In addition, there was no "disclosed framework based on either a stated estimate or past performance history by which to determine guidelines for the quantity term of a requirements contract." Ohio Rev.Code § 1302.19(A) (West 1998). As a result, the court finds that Goodyear and Heatway did not enter into any single requirements contract for flexible rubber hose, and further finds that the parties had separate contracts for each shipment of Entran II and Entran III hose. Therefore, Heatway may not seek relief under Ohio Rev.Code § 1302.91, and is liable for payment on each individual Entran III contract during 1995 and 1996. *Cf. Columbia Gas Transmission Corp. v. Larry H. Wright, Inc.*, 443 F.Supp. 14, 21 (S.D.Ohio 1977) (holding that plaintiff gas company may not properly withhold payment on any contract independent of contract alleged to have been breached by defendants).

■ In addition, the court finds no genuine issue of material fact as to whether Heatway suffered damages as a result of any defects in the Entran III hose. Under Ohio Rev.Code § 1302.91, Heatway would be entitled to deduct any damages due to defects in an Entran III hose from any part of the price due on the contract for that hose, because the defects would constitute a breach of the contract. As evidence of these defects, Heatway offers the declaration of Dan Chiles, who states that "[f]ailures of Goodyear's Entran III hose product to Heatway have also occurred. The exact amount of damages from these hose failures is presently not known." This declaration, however, is not sufficient to create a genuine issue of material fact. Under Fed.R.Civ.Pro 56(e), a nonmoving party may not rely on mere allegations or denials of the moving party's pleading. Chiles' declaration amounts to a mere allegation, and nothing more. Furthermore, just three months ago, Scott Haldiman, a Heatway representative responsible for tracking claims made by customers against Heatway, acknowledged that the Entran III hose has not been the subject of any hardening claims.

> Q. Fair enough. By the way Scott, amidst all of the claim materials that have been generated relative to hard or embrittled hose, can you tell us whether or not amonst those claims is any claim or hard hose or embrittled hose where an Entran III hose was involved?
>
> A. No, there has not been a claim. There have been suspected claims, but after full analysis, we have had no hardening of Entran III as of yet.
>
> Q. Okay. Can you tell me, Scott, amidst all of the claims that have been assembled by you relative to hard or embrittled hose, if there is—appear to be any claim that an Entran III–D hose has hardened or embrittled?
>
> A. No, I've not had a claim where Entran III–D has become embrittled or hard.

(Haldiman Dep. at 393.) Finally, in a letter dated April 1996, Mike Chiles admits that Heatway has seen no such problem with any Entran III hose. "The only failures we have seen are with Entran II, and perhaps limited production runs of Entran II." (Chiles Letter, Pl.'s Ex. 23 at 1, ¶ 2.) As a result, the court finds that the only defects legitimately at issue in this case concern Entran II hose, not Entran III.

■ Nevertheless the court agrees with Heatway that it should refrain from entering a final judgment on Goodyear's Entran III claim. Fed.R.Civ.Pro. 54(b) provides that

> [w]hen more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an *express determination that there is no just reason for delay* and upon an express direction for the entry of judgment.

Fed.R.Civ.Pro. 54(b) (West 1998). Thus, Rule 54(b) requires that if the court wishes

to enter judgment as to one or more but fewer than all of the claims, it must do so expressly. In addition, the court must expressly determine that there is no just reason to delay appellate review. *See General Acquisition, Inc. v. GenCorp., Inc.*, 23 F.3d 1022 (6th Cir.1994).

These requirements were further developed by the Sixth Circuit in *General Acquisition Inc.* In interpreting Rule 54(b), the Circuit initially held that district courts must "strike a balance between the undesirability of more than one appeal in a single action and the need for making review available in multiple-party or multiple-claim situations at a time that best serves the needs of the litigants." *Id.* at 1026 (citing Wright, Miller & Kane, Fed. Practice & Proc.2d § 2654 (1983)). It then listed five factors which a court must consider when deciding whether to enter a final judgment pursuant to Rule 54(b).

> (1) the relationship between the adjudicated and unadjudicated claims;
> (2) the possibility that the need for review might or might not be mooted by future developments in the district court;
> (3) the possibility that the reviewing court might be obliged to consider the same issue a second time;
> (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final;
> (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense and the like.

*Id.* at 1030. At a minimum, this case includes counterclaims which could result in a set-off against the final judgment on Goodyear's Entran III contracts claim. Therefore, the court shall exercise its discretion under Rule 54(d) and refrain from certifying the claim for final judgment.

### B.

Goodyear next asks the court to enter summary judgment on its declaratory judgment claim. In that claim, Goodyear seeks a declaration that its express disclaimers limit the extent to which it may be held accountable for any problem arising from its Entran II hose. As noted earlier, these disclaimers provided, in pertinent part, that

> All products sold as first-grade products are subject to any relevant warranty in effect at the time of shipment. All such products sold by The Goodyear Tire & Rubber Company are warranted to be free from defects in material and workmanship but such products are not warranted for any particular purpose, application or use. Any products claims to be defective shall, upon Goodyear's approval, be returned to Goodyear as designated, at the customer's expense. Goodyear will make an adjustment for material it finds to be defective either by repairing it, replacing it at an adjustment price, or by other suitable allowance.... Goodyear's responsibility shall not exceed the original purchase price of the product claimed to be defective, and in no event shall Goodyear be responsible for special, incidental or consequential damages....

> Other than those specifically set forth herein, there are no warranties which extend beyond the description of the products on the face hereof, either express or implied. No representative has authority to make any representation, promise or agreement, except as stated herein.

(Sample Conditions of Sale, Def.'s Ex. 18, ¶¶ 5–6.) Goodyear included these disclaimers among its standard terms and conditions.

Initially, the court notes that both parties acknowledge that "a dispute has arisen [concerning the effect and scope of Goodyear's disclaimers] and that the dispute requires immediate determination." (Answer ¶¶ 19–20.) Upon its own consideration, the court agrees that an actual controversy exists between the parties concerning the effect and scope of Goodyear's disclaimers. Thus, under the Declaratory Judgment Act, 28 U.S.C. § 2201, the court has jurisdiction to consider Goodyear's request for a declaration.

Having satisfied its duty to establish its jurisdiction, the court may next turn to the merits of Goodyear's request. In effect, Goodyear requests that the court limit its liability to only that which it has expressly

declared in its standard terms and conditions. As a result, the court must decide what effect the disclaimers have on any other express representations Goodyear may have made, as well as any implied warranties which arise as a matter of law.

In addition to any warranties expressly declared by a party to a contract, Ohio law generally recognizes two implied warranties which protect a purchaser of goods. The first is an implied warranty of merchantability. For goods to be merchantable, they must be "fit for the ordinary purpose for which such goods are used." Ohio Rev.Code § 1302.27(B)(3) (West 1998). This warranty arises in every sales contract in which the seller is a merchant of the goods transacted under the contract. The second implied warranty is an implied warranty of fitness for a particular purpose. This warranty arises "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skull or judgment to select or furnish suitable goods for that particular purpose." Ohio Rev.Code § 1302.28 (West 1998).

■ The court begins by considering the effect of Goodyear's disclaimers on any other express assurances made by Goodyear through its representatives. Ordinarily, Ohio law provides that a contracting party may disclaim any representations external to a written document by including appropriate limiting language. For example, a party may declare that "there are no warranties which extend beyond the face hereof." Ohio Rev.Code § 1302.29 (West 1998). Ohio courts do not, however, require that a party use this particular language, so long as its intent to disclaim is clear. *See Nordberg, Inc. v. Sylvester Material Co.*, 101 Ohio App.3d 89, 93, 654 N.E.2d 1358 (1995) (upholding the use of a disclaimer which declared that "this warranty is in lieu of all other warranties (except for title), expressed or implied including warranty of merchantability and of fitness for particular purpose."). In this case, Goodyear declared in its standard terms that "[o]ther than those specifically set forth herein, there are no warranties which extend beyond the description of the products on the face here-

of, either express or implied." It also declared that "[n]o representative has authority to make any representation, promise or agreement, except as stated herein, no representative has any authority to make any representation, promise or agreement except as stated herein."

According to Heatway, this language is insufficient to disclaim the express oral representations of Goodyear's representatives for three reasons. First, Heatway charges that Goodyear induced it into the Entran III contracts through fraud. Specifically, it charges that two Goodyear representatives, David Maguire and Thomas Alfredson, gave express representations about the quality and performance of Goodyear's hose which they knew to false, in order to mislead Heatway and induce reasonable reliance. This fraud, says Heatway, is sufficient to render Goodyear's disclaimer ineffective against the express representations of its agents.

Ohio law defines fraud to include: (1) any representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of the falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) and inducing justifiable reliance upon the representation; (6) resulting in injury proximately caused by the reliance. *Burr v. Board of County Commissioners of Stark County*, 23 Ohio St.3d 69, 73, 491 N.E.2d 1101 (1986). "One of the interests protected by the common law action for fraud is 'the interest in formulating business judgments without being misled by others … into making unwise decisions which result in financial loss.'" *Miles v. McSwegin*, 58 Ohio St.2d 97, 99, 388 N.E.2d 1367 (1979).

■ The court agrees that if Goodyear committed fraud in inducing any Entran II contract, it could not rely on the language of the contract for relief. As Judge Dowd has noted, "[a seller] cannot rely on a provision of the contract to bar [a buyer's] claim when the claim alleges the contracts were induced through fraud." *Invacare Corp. v. Sperry Corp.*, 612 F.Supp. 448, 451 (N.D.Ohio 1984). But as noted above, fraud requires reasonable reliance. No party to a contract can

claim such reliance upon any representation which is expressly disclaimed by another party, no matter what the content of the representation. After all, in disclaiming all external representations, one party effectively warns another that such representations are worthless.

This point was expressed with greater elegance by Judge Boggs in his concurring opinion in *Agristor Leasing v. A.O. Smith Harvestore Prods.*, 803 F.2d 1401 (6th Cir. 1986). In *Agristor*, a manufacturer of an animal feed storage system sued a systems purchaser for damages and payment due on a lease. In response, the purchaser filed a complaint against the manufacturer, its salesman, and its dealer for damages arising, in part, from false and fraudulent oral misrepresentations they allegedly made about the system. After denying motions for summary judgment and direct verdict, the district court entered judgment on a jury verdict in favor of the purchasers on their claim. On appeal, the Sixth Circuit panel affirmed in relevant part. The majority opinion began by affording significant deference to the district court in its interpretation of state law in a case arising under the diversity jurisdiction. "The interpretation of state law by a district judge is entitled to considerable deference." *Id.* at 1407. It then held that, in applying Tennessee law, "the district court did not err in denying summary judgment and a directed verdict on the basis of the disclaimers of reliance." *Id.*

In his concurring opinion, Judge Boggs emphasized the importance of distinguishing between disclaimers of liability and contractual disclaimers of reliance. Unlike the former, he wrote, the latter are competent evidence on the issue of reliance. *Id.* at 1410 (Boggs, J., concurring) ("I see a clear distinction between a disclaimer of liability and a disclaimer of reliance. The former is a direct attempt to avoid legal consequences; the latter is an attempt to establish a fact."). He then explained that unless courts enforce disclaimers of reliance to limit claims of fraud, parties will be deprived of the fundamental promises of contract law.

Furthermore, I believe that a contractual disclaimer of reliance may be competent evidence on the issue of whether the plaintiff had relied upon alleged misrepresentations, because a rule to the contrary would allow a person to enter into a commercial bargain, sign a contract containing an explicit term describing what that party did and did not rely upon in entering into the agreement, and then be relieved of any responsibility for that term when it later suited him. To illustrate, imagine what would have occurred had the [plaintiffs] paused just before signing the contract, declared that they didn't like the reliance-disclaimer clause, and insisted upon a contractual term stating explicitly that they relied upon all of the representations made in promotional literature and all of the representations made by the salesman. I can hardly imagine that, under those circumstances, the transaction would have gone forward unimpeded. Both my sense that the above-described scenario would endanger the deal and my conclusion that a disclaimer of reliance may be used to show that a plaintiff did not rely on particular representations, stem from the fundamental doctrine of Contracts that honors lawful, consensual, informed commercial agreements. I see no reason that this doctrine should disappear in the presence of an allegation of fraudulent misrepresentation.

*Id.* at 1410.

In this case, Goodyear included not only a limited disclaimer of liability, but also a full disclaimer of reliance in its standard terms and conditions. It disclaimed most liability when it declared that "[o]ther than those specifically set forth herein, there are no warranties which extend beyond the description of the products on the face hereof, either express or implied." Significantly, it also disclaimed reliance when it declared that "[n]o representative has authority to make any representation, promise or agreement, except as stated herein." These latter terms gave Heatway fair warning as to the reliability of any representation external to the terms. As a result, no reasonable jury could find that Heatway was itself reasonable in relying upon any such representation.

■ As an alternative to its fraud theory, Heatway asserts that the disclaimer is invalid because its language is inconsistent with the alleged express representations of Maguire and Alfredson. In support of its assertion, Heatway cites to Ohio Rev.Code § 1302.29(A), which provides in pertinent part that

> [w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of section 1302.05 of the Revised Code on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable.

(West 1998). However, under its own terms, § 1302.29(A) requires only that the court adopt a construction of the disclaimer that is reasonable. As discussed by Judge Boggs, it is entirely reasonable that a company disclaim in writing any reliance on all representations made outside the writing. Furthermore, in each of the cases cited by Heatway in support of its interpretation of § 1302.29(A), the contract included only a disclaimer of liability, not a disclaimer of reliance, as was the case here. *See Barksdale v. Van's Auto Sales, Inc.*, 62 Ohio App.3d 724, 728, 577 N.E.2d 426 (1989); *Centennial Ins. Co. of New York v. Vic Tanny Int'l of Toledo, Inc.*, 46 Ohio.App.2d 137, 75 O.O.2d 115, 346 N.E.2d 330 (1975); *Eckstein v. Cummins*, 41 Ohio App.2d 1, 321 N.E.2d 897, (1974).

Of course, both of these arguments, as well as Goodyear's original assertion, presume that Goodyear's standard terms and conditions, which include the disclaimers, were part of each of the Entran II contracts. As its final challenge to the effect of the disclaimers on any other express representation by Goodyear, Heatway argues that the disclaimers are insufficient because they were not part of the basis of the bargain between it and Goodyear. In particular, it asserts that the standard terms and conditions did not accompany a variety of shipments, and were never acknowledged in writing to have been received in any other form, including the letter sent to Mike Chiles on May 5,

1989. Furthermore, Heatway argues that the disclaimer would materially alter the distribution of risk associated with the hose, rendering invalid any claim that the disclaimer was accepted by acquiescence.

■ These arguments have merit. At a minimum, Heatway offers reasonable evidence that it never received Goodyear's standard terms on a number of individual shipments of Entran II hose. (*See, e.g.,* Mike Chiles Decl. ¶ 19; *see also* Def.'s Ex. 11, 12.). Thus, as to those shipments, a genuine issue exists as to whether Heatway had sufficient notice of the disclaimers. Furthermore, a genuine issue remains even as to those shipments which arrived after Heatway learned of Goodyear's disclaimers. Under Ohio Rev. Code § 1302.10,

> [t]he additional terms are to be construed as proposals for additions to the contract. Between merchants, the terms become part of the contract *unless* one of the following applies:
>
> . . .
>
> (2) They *materially alter* it.
>
> . . . .

Ohio Rev.Code § 1302.10 (West 1998) (emphasis added). Thus, under § 1302.10, if Goodyear's disclaimers materially alter any contract, the disclaimers may not be considered a part of that contract.

Various courts have struggled in defining just what it means to "materially alter" a contract under Ohio Rev.Code § 1302.10, or its UCC model, UCC § 2–207. In one case, *Kathenes v. Quick Chek Food Stores*, 596 F.Supp. 713 (D.N.J.1984), the court first noted that Comment 5 to UCC § 2–207 specifically cross-references UCC § 2–719. That section provides, in pertinent part, that a contract

> may limit or alter the measure of damages recoverable . . ., as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts.

*See* Ohio Rev.Code § 1302.93(A)(1) (West 1998) (codifying UCC § 2–719). It then held that as long as a clause is reasonable under UCC § 2–719, it does not materially alter a contact under UCC § 2–207.

Other courts have criticized the *Kathenes* view. For example, in *Dale R. Horning Co., Inc. v. Falconer Glass Industries, Inc.*, 730 F.Supp. 962 (S.D.Ind.1990), the court agreed that reasonableness under UCC § 2–719 was relevant to a finding of materiality under UCC § 2–207. However, it rejected the notion that reasonableness alone was sufficient to such a finding. First, the court noted that the ultimate question under UCC § 2–207 is whether the clause would result in surprise or hardship if incorporated without the express awareness' of the nonassenting party. It then found that a clause could be entirely reasonable under UCC § 2–719 and still result in hardship or surprise.

> While this Court recognizes that Official Comment 5 does, in fact, make reference to § 2–719, the Court does not find that it necessarily follows that any limitation of consequential damages does not "materially alter" the parties' contract (§ 2–207 language) just because the limitation would be "reasonable." (§ 2–719). The statutory language of § 2–207 speaking to material alteration focuses on two elements: surprise or hardship. The fact that a clause may be reasonable under the remedy provision of § 2–719 does not dictate the outcome of the contract formation analysis under § 2–207. The ultimate question remains whether such a limitation would surprise or work a hardship on the buyer; the issue of reasonableness is properly viewed as just one aspect of this material alteration analysis.

*Id.* at 965–6. *See also Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 765 (10th Cir.1983) ("A limitation of remedy generally constitutes a material alteration"); *Westinghouse Electric Corp. v. Nielsons, Inc.*, 647 F.Supp. 896, 900 (D.Colo.1986) (limitation of seller's liability for incidental and consequential damages is a material alteration); *Album Graphics, Inc. v. Beatrice Foods Co.*, 87 Ill. App.3d 338, 42 Ill.Dec. 332, 408 N.E.2d 1041, 1048 (1980) ("A term disclaiming warranties, and we might add a term limiting remedies, is undoubtedly a term that materially alters a contract.").

The court finds the latter interpretation of UCC § 2–207, and hence Ohio Rev.Code

§ 1302.10, to be more persuasive. In contrast to *Kathenes*, this interpretation focuses on the ultimate issue under UCC § 2–207, not just one particular element relevant to that issue. Also, this interpretation preserves the integrity of the two separate provision of the code. Conversely, under the *Kathenes* interpretation, either UCC § 2–207 or UCC § 2–719 is rendered redundant under circumstances such as these. Accordingly, this court shall join those other courts which define an alteration as material if it would "result in surprise or hardship if incorporated without the express awareness' of the nonassenting party." *Trans–Aire International, Inc. v. Northern Adhesive Co., Inc.*, 882 F.2d 1254, 1261 (7th Cir.1989) (citing Comment 4 to UCC § .).

■ Applying this definition to the instant case, the court finds that a reasonable jury could determine that Goodyear's proffered disclaimers materially alter the express representations which Heatway alleges were made by Goodyear's representatives. In addition, that same jury could find that the proffered disclaimers materially alter the implied warranties of merchantability and fitness imposed against Goodyear under Ohio law. First, Heatway offers evidence that Goodyear expressly agreed to bear the economic risk of any Entran II hose failure. (*See, e.g.,* Eudaly Dep., Def.'s Ex. 21 at 68, 138; Mike Chiles Aff. ¶ 20.) Second, the Ohio law of implied warranties would also impose significantly greater liability than that declared by Goodyear in its disclaimers. Therefore, the court must preserve the issue of materiality for the jury. *Cf. Transamerica Oil Corp.*, 723 F.2d at 765 ("The issue of whether a term materially alters the contract ... is a question of fact that must be determined in light of the facts of the case and the parties' expectations.") (citing *Medical Development Corp. v. Industrial Molding Corp.*, 479 F.2d 345, 348 (10th Cir.1973); *Ebasco Services Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421, 442–43 (E.D.Pa.1975)).

Heatway raises additional challenges to the effect of the disclaimers on Goodyear's implied warranties. First, Heatway asserts that Goodyear's fraud precludes its attempt

to disclaim any implied warranty. However, as discussed earlier, the court finds that Heatway may not maintain any fraud action for any contract formed after it received Goodyear's disclaimer of reliance. Second, Heatway argues that Goodyear did not adequately disclaim its implied merchantability warranty, because it did not conspicuously mention the word "merchantability" in its writings. *See* Ohio Rev.Code § 1302.29 (West 1998). Upon its own review of the writings, the court agrees that the writings do no mention "merchantability" at all, let alone conspicuously. Therefore, the court finds as a matter of law that Goodyear has not adequately disclaimed its implied warranty of merchantability.

Heatway raises two other challenges. It asserts that Goodyear's disclaimer does conspicuously limit its implied warranty of fitness. This, too, remains an issue of material fact, and must be preserved for the jury. Finally, Heatway argues that the asserted disclaimers of liability fail of their essential purpose, and are unconscionable. *See* Ohio Rev.Code § 1302.93(B) (West 1998); Ohio Rev.Code § 1302.05(A) (West 1998). Under Ohio law, courts may not give effect to any disclaimer of liability which precludes an aggrieved party from receiving the full benefit of its bargain. *Goddard v. General Motors Corp.*, 60 Ohio St.2d 41, 47–48, 396 N.E.2d 761 (1979). In addition, courts may not enforce any limitation which is unconscionable. *See* Ohio Rev.Code § 1302.15(A) (West 1998). Failure of essential purpose is a question of fact, however, *see Delorise Brown, M.D. v. Allio*, 86 Ohio App.3d 359, 362, 620 N.E.2d 1020 (1993) (citing *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 537 N.E.2d 624 (1989)), and the court finds each of the parties offer relevant and significant evidence in support of their respective views. Consequently, the court must allow the parties to present that evidence to jury, and rely on the jury's considered judgment. Conversely, unconscionability is a question of law, and must be decided by the court. *Insurance Co. of North America v. Automatic Sprinkler Corp.*, 67 Ohio St.2d 91, 423 N.E.2d 151 (1981). Ohio law, however, counsels against any finding of unconscionability in the absence of a fair opportunity for the parties to present evidence on the contract's commercial setting, purpose, and effect. *Jones v. Asgrow Seed Co.*, 749 F.Supp. 836, 837 (N.D.Ohio 1990) (citing Ohio Rev.Code § 1302.15(A)). In this case, that opportunity must include the opportunity to present evidence on the issue at trial. Consequently, the court shall reserve the issue until that time.

### IV.

To sum up, the court finds as follows:

1. Goodyear is entitled to payment on all of its Entran III contracts with Heatway during 1995 and 1996, as requested in its complaint. However, the court shall refrain from entering final judgment on this claim pursuant to its discretion under Fed.R.Civ.Pro. 54(b).

2. A genuine issue of material fact remains as to whether the disclaimers contained in Goodyear's standard terms and conditions are a part of the parties' contracts for Entran II hose.

3. Heatway may not assert a claim of fraud against Goodyear on any contract formed after it received a copy of Goodyear's disclaimer of reliance.

4. Goodyear did not adequately disclaim its implied warranty of merchantability under Ohio law, because its disclaimer did not contain the word "merchantability."

5. A genuine issue of material fact remains as to whether Goodyear conspicuously disclaimed its implied warranty of fitness for a particular purpose.

6. A genuine issue of material fact remains as to whether Goodyear's disclaimer of liability fails of its essential purpose.

7. The court shall reserve judgment until trial as to whether Goodyear's disclaimer of liability is unconscionable.

IT IS SO ORDERED.